THE PEOPLE OF THE STATE OF ILLINOIS, Appel-
lee, v. EDWARD SPREITZER, Appellant.

*Opinion filed March 23, 1988.—Rehearing
denied May 31, 1988.*

Charles M. Schiedel, Deputy Defender, of Springfield, and Charles Hoffman, Assistant Appellate Defender, of Chicago, of the Office of the State Appellate Defender, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Roma Jones Stewart, Solicitor General, and Terence M. Madsen and Scott Graham, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

Together with codefendants Andrew and Thomas Kokoraleis, the defendant, Edward Spreitzer, was indicted in the circuit court of Du Page County for the knowing murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(2)) and aggravated kidnapping (Ill. Rev. Stat. 1985, ch. 38, par. 10—2(a)(3)) of Linda Sutton. The circuit court granted the defendant's motion for a severance and accepted his waiver of a jury trial. After a bench trial, the defendant was found guilty of both charges. The State then requested a death penalty hearing and the defendant elected to be sentenced by a jury. Upon proof that the defendant was 18 years of age or older at the time of the offenses and that he had committed multiple murders, a statutory aggravating factor (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3)), the jury found the defendant eligible for the death penalty. After hearing evidence in mitigation, the jury found that there were no mitigating factors sufficient to preclude a sentence of death. The circuit court imposed a sentence of death and 60 years in prison for aggravated kidnapping. The death sentence has been stayed (107 Ill. 2d R. 609(a)) pending direct re-

view by this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603).

## The Convictions

At the defendant's bench trial, the State presented the following evidence. The victim, Linda Sutton, was last seen alive at 11 p.m. on May 23, 1981, in Chicago. Her partially decomposed body was found seven days later in a field east of the Brer Rabbit Motel in Villa Park, Illinois. Her breasts had apparently been amputated, and her hands were cuffed behind her back. A coroner's autopsy established that her death was probably caused by several stab wounds in her chest.

In November of 1982, after an investigation by Chicago law enforcement authorities into a series of similar homicides, the defendant confessed to participating in the killing of Linda Sutton.

On November 5, 1982, the defendant spoke with Chicago Detective Thomas Flynn and Cook County Assistant State's Attorney Richard Beuke. He gave them a statement which contained the following facts.

In May 1981, the defendant was living in the Brer Rabbit Motel and working at Winchell's Donut Shop. While working there he met a man named Robin Gecht, who occasionally visited the shop, usually after midnight. On one particular night, when the defendant's car would not start, the defendant left work after his supervisor, who had promised to give him a ride into Chicago, failed to show up. Seeing Gecht in the area, the defendant asked him for a ride into Chicago, and Gecht agreed.

After they had been riding together in Gecht's van for some time, they decided to "pick up some whores." When they reached the corner of Broadway and Addison streets in Chicago, Gecht "took him to the back of the van and told him that when they found a whore they wanted to get *** (the defendant) would get into the

back of the van and stay there until he heard two taps to the side of the van, and when he heard the two taps, he was to get out of the van and come and help Gecht." Gecht said that they would "take care of the whore." He assured the defendant that the defendant would not "get into any trouble."

After the defendant had entered the rear of the van he heard Gecht speaking with someone whom the defendant described as having a black female voice. She entered the front part of the van. After a brief discussion, overheard by the defendant, Gecht gave her "a couple of pills." The three then drove west for approximately 30 minutes. When the van stopped, the defendant heard two taps and he left from the rear of the van, meeting Gecht outside the front passenger door. Gecht was holding a pair of handcuffs and a knife. A black woman, whom the defendant later identified from a photograph as Linda Sutton, was sitting in the front passenger seat. Gecht pulled her out of the van, handcuffed her wrists, and then pushed her into a wooded or "bushy" area a short distance from the van.

After Gecht and Sutton had been in the bushes for five minutes, the defendant heard Sutton moaning and saying: "What are you doing to me? Why are you doing this?" Hearing Gecht whistle, the defendant went over to the bushes, where he saw that Gecht had severed one of Sutton's breasts and was "having sex" with the area where the breast had been severed. Sutton's severed breast was lying next to her on the grass.

Gecht told the defendant to get some wire from the van. The defendant returned from the van with the wire, which Gecht then used to sever Sutton's other breast. The defendant then "had sex" with the area where the other breast had been severed. After the defendant had finished, Gecht picked up the wire and the two severed breasts. Sutton was still in the bushes with her hands

cuffed behind her back. The two men left the scene, and Gecht drove the defendant to the defendant's mother's home.

In a second statement, the defendant gave a differing version of these events. This second statement was given to Assistant State's Attorney Beuke on November 8, 1982. In this statement the defendant maintained that Andrew Kokoraleis was also present when Sutton was picked up. When Sutton began to scream, Kokoraleis punched her, knocking her into the rear of the van. As she continued to scream, Kokoraleis and the defendant "punched her several times in the face until she shut up." They then drove to the Brer Rabbit Motel and took her to the defendant's room. After she was gagged and handcuffed to the bedposts, Gecht, Kokoraleis, and the defendant each sexually assaulted her. At several points Kokoraleis stuck a "Coke" bottle into her vagina. Later they took her from the motel and killed her as the defendant had described in his earlier statement.

The defendant also testified in his own behalf. He admitted the truth of the statement of November 5, but retracted the statement of November 8. He admitted that he had, supposedly on Gecht's orders, removed Sutton's remaining breast with the wire he had taken from the van. He also admitted placing his erect penis in the wound on Sutton's chest where her breast had been, and leaving it there for some period of time shorter than five minutes.

The circuit court judge found the defendant guilty of the murder and aggravated kidnapping of Linda Sutton.

The defendant raises only one challenge to his conviction. He claims that the prior involvement of Du Page County Public Defender Peter Dockery as a prosecutor in his case disqualified Dockery and all assistant defenders in his office from representing the defendant. The facts pertinent to this claim follow.

At the time of the defendant's indictment, the Du Page County public defender, Frank Wesolowski, was appointed to represent the defendant. Wesolowski assigned the defendant's case to Assistant Public Defender Edward Ward. On June 4, 1985, Ward advised the court that he had resigned his position as an assistant public defender but that he would continue to represent the defendant until a replacement had been hired. Two weeks later, on June 18, 1985, Wesolowski himself appeared on behalf of the defendant and informed the court that he would be assigning the defendant's case to Assistant Public Defender Carol Anfinson. Wesolowski also informed the court that he had hired Peter Dockery, formerly an assistant State's Attorney in the office of the State's Attorney of Du Page County, to replace Ward. According to Wesolowski, Dockery was "very much involved" in the decision to charge Spreitzer for the murder of Linda Sutton. Wesolowski then stated, and the assistant State's Attorney present agreed, that Dockery could not be assigned to the case because of a conflict of interest stemming from his former involvement in the case's prosecution.

Ward continued to represent the defendant by special appointment until September 23, 1985. On that date, Ward was allowed to withdraw and the public defender's office was reappointed to represent the defendant. Assistant Public Defender Anfinson then filed her appearance on the defendant's behalf. By early February 1986, prior to the start of the defendant's trial, Dockery had become the Du Page County public defender and his name began to appear as the defendant's attorney on pleadings filed by the defense. His name first appeared on such a pleading on February 12, 1986.

While the defendant claims he was deprived of the effective assistance of counsel by a conflict of interest, he has not made entirely clear the nature of the conflict be-

ing alleged. It is clear that the conflict is premised upon Dockery's personal involvement in the decision to charge the defendant, and not merely upon his employment as an assistant State's Attorney at the time the defendant was charged. However, the defendant has not made clear when Dockery's association with the public defender's office triggered the alleged conflict. At times, the defendant seems to be arguing that the conflict was created when Dockery was appointed to be an assistant public defender; more often he appears to be arguing that the conflict was created when Dockery became the public defender and the head of the public defender's office. He explicitly divides his argument into the claim that Dockery's status as the public defender disqualified "Dockery," *i.e.*, the office of the public defender, from appearing on his behalf, and into the separate argument that Anfinson's status as Dockery's employee disqualified her from representing the defendant. The defendant also claims that the conflict was *"per se"* and requires no showing of "prejudice"; in the alternative he claims that weaknesses in Anfinson's performance as his attorney demonstrates that he was in fact "prejudiced" by her subliminal reluctance to attack her employer. Both sides agree that Dockery was disqualified from personally representing the defendant.

The prohibition against conflicts of interest is based upon the principle that "no man can serve two masters." Such service by a criminal defense attorney may implicate his client's constitutional rights. Persons accused of crime enjoy a sixth amendment right to the effective assistance of counsel. (*Cuyler v. Sullivan* (1980), 446 U.S. 335, 343, 64 L. Ed. 2d 333, 343, 100 S. Ct. 1708, 1715; *Glasser v. United States* (1942), 315 U.S. 60, 70, 86 L. Ed. 680, 699, 62 S. Ct. 457, 464-65.) Effective assistance means assistance by an attorney whose allegiance to his client is not diluted by conflicting interests

or inconsistent obligations. (*People v. Washington* (1984), 101 Ill. 2d 104, 110; see also *People v. Franklin* (1979), 75 Ill. 2d 173; *People v. Kester* (1977), 66 Ill. 2d 162; *People v. Stoval* (1968), 40 Ill. 2d 109.) So much is clear. What has been perhaps less clear, both for ourselves and for the United States Supreme Court, is when and under what circumstances conflicting interests will mandate the reversal of a conviction.

This lack of clarity has partially stemmed from a confusing, and sometimes inconsistent, use of such terms as *"per se* conflict," "potential conflict," "possible conflict," "actual conflict," "prejudice," and "actual prejudice." To clarify these terms, and to set the stage for our analysis, we review the relevant law.

The term *"per se"* conflict does not appear in the United States Supreme Court case law, or for that matter, in cases from our sister jurisdictions. Instead, it was a term invented by our court in *People v. Coslet* (1977), 67 Ill. 2d 127, 133, to describe the holding in *Coslet* and our prior holdings in *People v. Kester* (1977), 66 Ill. 2d 162, and *People v. Stoval* (1968), 40 Ill. 2d 109. Subsequently, *People v. Fife* (1979), 76 Ill. 2d 418, and *People v. Washington* (1984), 101 Ill. 2d 104, have also applied a *per se* conflict of interests rule.

In each of these cases certain facts about a defense attorney's status were held to engender, *by themselves*, a disabling conflict. In every case the conflict was created by the defense attorney's prior or contemporaneous association with either the prosecution or the victim. (See *People v. Washington* (1984), 101 Ill. 2d 104 (defense attorney simultaneously served as a part-time attorney for the municipality where the defendant was being prosecuted); *People v. Fife* (1979), 76 Ill. 2d 418 (defense attorney simultaneously served as a special assistant Attorney General handling unemployment compensation cases for the State on a part-time basis); *People v. Coslet*

(1977), 67 Ill. 2d 127 (defense attorney simultaneously served as the attorney for the administrator of the victim's estate); *People v. Kester* (1977), 66 Ill. 2d 162 (defense attorney had previously served as the assistant State's Attorney in the State's prosecution of the defendant and had made three court appearances on the State's behalf); *People v. Stoval* (1968), 40 Ill. 2d 109 (defense attorney and his firm simultaneously represented the defendant, the corporation whose store had been burglarized and the store's owner).) In each of these cases we have said that there is no need to show that the attorney's actual performance was in any way affected by the existence of the conflict. (See *People v. Washington* (1984), 101 Ill. 2d 104, 109, 113 (conflict found where defense attorney was obliged to cross-examine police officers employed by the municipality he represented, even in absence of allegation that cross-examination was in any way defective); *People v. Fife* (1979), 76 Ill. 2d 418, 422 (conflict found even though "[t]he defendant does not believe that counsel here was anything less than diligent"); *People v. Coslet* (1977), 67 Ill. 2d 127, 135-36 (conflict found even though question of attorney's performance is "not before us"); *People v. Kester* (1977), 66 Ill. 2d 162, 168 (conflict found despite absence of showing that "counsel did not represent the defendant in a competent and dedicated manner with complete loyalty to him"); *People v. Stoval* (1968), 40 Ill. 2d 109, 113 (conflict found despite absence of showing that "the attorney did not conduct the defense of the accused with diligence and resoluteness").) Another way of expressing the same result has been to say that, as to *per se* conflicts, the defendant need not show "prejudice" or "actual prejudice" in order to secure a reversal of his conviction. See *People v. Stoval* (1968), 40 Ill. 2d 109, 113.

16

The justification for treating these conflicts as *per se* has been that the defense counsel in each case had a tie to a person or entity—either counsel's client, employer, or own previous commitments—which would benefit from an unfavorable verdict for the defendant. The existence of such a tie created, in each instance, several problems. First, the knowledge that a favorable result for the defendant would inevitably conflict with the interest of his client, employer or self might "subliminally" affect counsel's performance in ways difficult to detect and demonstrate. (See *People v. Washington* (1984), 101 Ill. 2d 104, 113 (noting "possibility *** that the attorney's duty of undivided loyalty to the accused was affected by contradicting obligations" to the municipality he served as a prosecutor, and "the subtle and subconscious pressure the suggested conflict may have had on counsel"); *People v. Fife* (1979), 76 Ill. 2d 418, 424 (noting "the possible, perhaps subliminal pressure a defense counsel who is also a special assistant for workmen's compensation cases might receive from the Attorney General's office"); *People v. Kester* (1977), 66 Ill. 2d 162, 167 (noting possibility that attorney "might be subject to subtle influences which could be viewed as adversely affecting his ability to defend his client in an independent and vigorous manner," and that "[i]t might be contended, for example, that the advice and performance of court-appointed counsel in such a situation was affected by a subliminal reluctance to attack pleadings or other actions and decisions by the prosecution which he may have been personally involved with or responsible for"); *People v. Stoval* (1968), 40 Ill. 2d 109, 113 (noting that representation by an attorney who labors under a possible conflict of interests is "unfair to the accused, for who can determine whether his representation was affected, at least, subliminally, by the conflict").) A second consideration in *per se* conflict of interest cases has

been the possibility that the conflict will unnecessarily subject the attorney to "later charges that his representation was not completely faithful." (*Stoval*, 40 Ill. 2d at 113; see also *Kester*, 66 Ill. 2d at 168 ("a lawyer who may have provided an able and vigorous defense with complete loyalty to the defendant is placed in the difficult and unfortunate position of being subject to unfounded charges of unfaithful representation").) In these situations, we have reversed convictions unless the record reflects that the defendant has been made aware of the conflict and has knowingly waived his right to conflict-free counsel. *E.g., People v. Fife* (1979), 76 Ill. 2d 418, 424.

In a second class of alleged conflicts, neither our court nor the United States Supreme Court has used the term *per se*, and have sometimes refused to reverse a conviction without a showing that the conflict actually affected the attorney's performance. These conflicts have generally, although not exclusively (see *People v. Banks* (1987), 121 Ill. 2d 36), involved joint or multiple representation of codefendants. (See, *e.g., Cuyler v. Sullivan* (1980), 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708; *People v. Jones* (1988), 121 Ill. 2d 21; *cf. People v. Robinson* (1979), 79 Ill. 2d 147; *People v. Spicer* (1979), 79 Ill. 2d 173.) Treating multiple representation as creating a *per se* conflict would put an end to multiple representation altogether, since a "possible conflict inheres in almost every instance of multiple representation," and a *per se* rule would "preclude multiple representation even in cases where '[a] common defense *** gives strength against a common attack.'" (*Cuyler*, 446 U.S. at 348, 64 L. Ed. 2d at 346, 100 S. Ct. at 1718, quoting *Glasser v. United States* (1942), 315 U.S. 60, 92, 86 L. Ed. 680, 710-11, 62 S. Ct. 457, 475 (Frankfurter, J., dissenting).) In these situations, two distinct lines of analysis have been employed, depending upon whether

the trial court was ever apprised of the possible or potential conflict.

If counsel brings the potential conflict to the attention of the trial court at an early stage, a duty devolves upon the trial court to either appoint separate counsel or to take adequate steps to ascertain whether the risk of conflict was too remote to warrant separate counsel. (*Holloway v. Arkansas* (1978), 435 U.S. 475, 484, 55 L. Ed. 2d 426, 434, 98 S. Ct. 1173, 1178.) If such steps are not taken, the fact of a *"potential* or *possible* conflict may deprive the defendant of the guaranteed assistance of counsel." (Emphasis in original.) (*People v. Jones* (1988), 121 Ill. 2d 21, 28.) While this rule is not *per se* (since it is the attorney's contemporaneous allegations of a conflict and not the mere presence of multiple representation which gives rise to the trial court's duty), reversal of a conviction under this rule does not require a showing that the attorney's actual performance was in any way affected by the purported conflict. In this sense, reversal for the trial court's failure to alleviate possible or potential conflicts does not require a showing of "specific prejudice." *Holloway*, 435 U.S. at 487, 55 L. Ed. 2d at 436, 98 S. Ct. at 1180.

However, if the trial court is not apprised of the potential conflict, then reversal of the conviction will only be had upon a showing that "an actual conflict of interest adversely affected" counsel's performance. (*Cuyler*, 446 U.S. at 350, 64 L. Ed. 2d at 348, 100 S. Ct. at 1719.) What this means is that the defendant must point to some specific defect in his counsel's strategy, tactics, or decision making attributable to the conflict. In this sense, proof of an actual conflict of interest requires proof of what we have sometimes referred to in our *per se* cases as "prejudice" or "actual prejudice." On the other hand, it is also clear that the defendant is never required to prove that his attorney's deficiencies did not

constitute harmless error. He is not required, in other words, to prove that the conflict contributed to his conviction. This is what is meant by the statements that can be found in our cases and in United States Supreme Court cases to the effect that "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." (*Cuyler*, 446 U.S. at 349-50, 64 L. Ed. 2d at 347, 100 S. Ct. at 1719; see also *People v. Washington* (1984), 101 Ill. 2d at 110, 112 ("the defendant need not show prejudice in order to justify a reversal of his conviction if the attorney representing him has an actual or possible conflict of professional interests" and "[w]hen an actual conflict has been shown, it is unnecessary to demonstrate prejudice in order to sustain a claim of violation of the right to the assistance of counsel").) Having hopefully clarified the meaning of key terms in our analysis, we proceed to the merits of the defendant's claim.

As we have stated above, we proceed on the assumption that the defendant is basing his claim only on Dockery's personal involvement in the decision to charge him, and not merely upon Dockery's employment as an assistant State's Attorney at the time of that decision. The latter claim would be utterly without merit. As the State cogently argues, it would be ludicrous to disqualify Dockery or the Du Page County public defender's office from handling any cases which were initiated during Dockery's employment as an assistant State's Attorney and which were still pending at the time he became an assistant public defender or at the time he became the public defender. Such a rule would have the undesirable effect of discouraging public defender's offices from hiring competent former prosecutors. Particularly in small counties where the entire criminal bar is itself not very large, a *per se* rule against assignment of an entire co-

hort of cases to a public defender who happens to employ a former prosecutor would be an administrative and financial nightmare. The defendant has not identified any interest which would justify such a rule.

Proceeding on the assumption that the defendant is only arguing for the existence of a conflict in those cases where Dockery had some personal prosecutorial involvement, we next consider the broad claim that a conflict was created at the time he was hired as an assistant public defender. We find this claim also to be without merit.

Insofar as Dockery's employment as an assistant public defender created any conflict at all, it could only have been because Anfinson might have been subliminally reluctant to attack the prior decisions or behavior of someone who was now her colleague and associate. In support of this argument, the defendant cites one of the ABA's Standards for Criminal Justice which provides that "[i]t is unprofessional conduct for a lawyer to defend a criminal case in which the lawyer's partner or other professional associate is or has been the prosecutor." (ABA Standards for Criminal Justice (The Defense Function, Standard 4—3.5(d) (2d ed. 1986)).) A literal reading of Standard 4—3.5(d) would preclude Anfinson from defending a case in which her associate, Dockery, had been the prosecutor.

We are reluctant to apply Standard 4—3.5(d) to professional "associates" in a public defender's office, at least as a flat prohibition or *per se* rule. Our reluctance stems from several sources. First, we are mindful of the fact that we have declined to create a *per se* rule in the analogous situation of two public defenders from the same office who represent codefendants. (See *People v. Robinson* (1979); 79 Ill. 2d 147; *People v. Spicer* (1979), 79 Ill. 2d 173.) Absent a showing of special circumstances which might engender an actual conflict, we

have trusted to the naturally adversarial instinct of a public defender to put his client's interests first.

The defendant counters that this case is more similar to our *per se* cases, since it involves a conflict between representation of interests which are irreconcilably divergent, those of the prosecution and the defense, rather than the possibly harmonious interests of codefendants. The defendant's argument misses the point. The asserted danger in the *Banks-Robinson-Spicer* line of cases was not so much that a single lawyer would attempt to represent the conflicting interests of two defendants as that a lawyer's loyalty to his client would be diluted by a conflicting allegiance to a fellow lawyer. Similarly, this asserted conflict also involves a choice between the interests of a client and the interests of a colleague. Unlike our *per se* cases, it does not involve a direct conflict between the interests of two opposing clients or between a present client and a past personal commitment. It is therefore more appropriate to apply the case-by-case analysis of the *Banks-Robinson-Spicer* line of cases rather than the *per se* approach of *Stoval* and its progeny.

Our conclusion in this respect is not affected by the decisions in *United States v. Kitchin* (5th Cir. 1979), 592 F.2d 900, and *State v. Morelli* (1977), 152 N.J. Super. 67, 377 A.2d 774. In each of those cases, the prosecution, rather than the defense, invoked Standard 4—3.5(d). In each case, the prosecution wished to prevent the representation of the defendant by an attorney associated in practice with a second attorney who had previously played a role in the prosecution of the defendant. Both of these cases were premised upon the prosecution's interest in preventing the revelation of confidential information to the defense. The State has not invoked such an interest here.

We therefore hold, that insofar as the defendant's claim is premised upon the mere employment of Dockery as an assistant public defender, it does not assert a *per se* conflict. We next consider whether a *per se* conflict was created by Dockery's elevation to the post of public defender.

We do not agree with the defendant that Anfinson's status as Dockery's employee created a *per se* conflict. Unlike the conflicts posed in our other *per se* cases, the asserted disjunction between Anfinson's duty to her client and her supposedly conflicting loyalty to Dockery is extremely speculative and remote. We are asked to believe that Anfinson would refrain from zealously representing her client because such representation might embarrass Dockery in some way. But Dockery's tie to the prosecution, a tie which was itself fairly tenuous, would be counterbalanced by his present status as the public defender. Presumably he was more interested in winning cases currently assigned to his office than in protecting the integrity of the decisions he had made when he was a prosecutor. Moreover, the subliminal reluctance felt by the prosecutor-turned-defense counsel in *Kester* towards attacking his own *personal* decisions would not apply to Anfinson, who would not have to attack anything she had *personally* done.

Since there was no *per se* conflict it remains to be determined whether there was a potential conflict brought to the attention of the court or an actual conflict demonstrated by the performance of counsel at trial. Clearly, the potential conflict was not brought to the attention of the court. Anfinson made no motions for appointment of separate counsel after Dockery became the public defender and never raised the issue in any other form.

The defendant's brief contains a number of conclusory allegations to the effect that Anfinson's performance at trial was hampered by an actual conflict of inter-

est. However, the defendant fails to identify any specific deficiencies in Anfinson's performance which might have stemmed from the alleged conflict.

We therefore affirm the defendant's conviction, and move on to consider the alleged errors which relate to the defendant's sentences.

## The Sentences

Following the defendant's conviction, the State requested a death penalty hearing, citing the "multiple murder conviction" aggravating factor (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3)), and the defendant elected to be sentenced by a jury.

At the death qualification phase of the hearing, the State introduced a certified copy of the defendant's conviction for the murder of Linda Sutton. The State also proved that the defendant was 20 years old at the time of the murder. Through the testimony of Assistant State's Attorney Joel Goldstein, the State established that in April 1984, the defendant had pled guilty to four murders in Cook County. The victims were Shui Mak, Rose Davis, Sandra Delaware, and Raphael Tiradao. The jury found the defendant eligible for the death penalty.

At the second phase of the death penalty hearing, the State presented the following evidence in aggravation.

Du Page sheriff's Detective Warren Wilcosz and Investigator Thomas Vosburgh described the discovery of Linda Sutton's body on June 1, 1981, near the Brer Rabbit Motel. Wilcosz further testified that in October 1982 he learned of a similar incident in which a black woman named Beverly Washington had been found in an alley in Chicago. Her breasts had been mutilated, but she was alive. Washington told Chicago police that she had entered a van, had been given pills, and had lost consciousness. She described the van as a Red Dodge with blue and white feathers hanging from the rear view mirror

and a wooden partition which separated the front of the van from the rear. Upon learning these facts, Wilcosz contacted Chicago police and told them of the facts of the Sutton case.

On October 20, 1982, Chicago police detective Thomas Flynn stopped a van which fit the description given by Beverly Washington and which was being driven by the defendant. The defendant told Flynn that the van belonged to his employer, Robin Gecht. The defendant then took Flynn to Gecht, who produced registration for the van. Gecht and the defendant were then taken to Area Five Police Headquarters and released.

On October 26, and November 5, 1982, Du Page Detective Wilcosz spoke with the defendant at the defendant's home. The defendant acknowledged that he had been to the field east of the Brer Rabbit Motel many times to take drugs, have sex with girls, and to ride his motorcycle. He also told Wilcosz that he had ridden with Gecht in Gecht's van on May 23, 1981, and that they had picked up a black prostitute. However, they had become involved in a fight with some pimps and the prostitute had left. The defendant failed to identify a photograph of Sutton as the prostitute.

On the evening of November 5, 1982, the defendant agreed to come to Area Five for further questioning. There he admitted to Detective Flynn his involvement in the Sutton and Washington cases. Later that night, the defendant made additional statements to Flynn and to Assistant State's Attorney Beuke, in which the defendant further admitted involvement in a number of other unsolved killings and maimings. According to the defendant, the first killing he had been involved in was that of Linda Sutton.

Evidence of the defendant's statement about Sutton was the same as that presented at trial, discussed earlier

in this opinion. The defendant's account of the other killings follows in chronological order.

The second killing took place on July 1, 1981, slightly over one month after the murder of Linda Sutton. The defendant and Gecht picked up a black female hitchhiker near North Avenue and Route 83. She took some pills and became "spacey." Gecht then drove to a cemetery where he parked, pulled the woman out of the car, and struck her twice with a baseball bat. Five minutes later, Gecht returned to the van with the bat and with one of the woman's breasts. The identity of this woman is unknown.

The third killing took place in August of 1981. Gecht gave the defendant a ride to Winchell's Donuts to pick up the defendant's paycheck. They saw a black female hitchhiker. Gecht told the defendant to get into the rear of the van. Gecht picked the hitchhiker up and drove to a forest preserve. He stopped the car, and tapped twice on the floor of the van. The defendant then left the van through the rear door, taking a knife and a pair of handcuffs with him. Meeting Gecht at the front passenger door, he gave the knife and handcuffs to Gecht, who put the handcuffs on the woman.

Gecht told the defendant to stay near the van while he took the woman into a wooded area. As the defendant sat in the van, he saw Gecht knock the woman down. Five minutes later, Gecht returned to the van with one of the woman's breasts. The identity of this woman is also unknown.

The third victim was Lorraine Borowski, who was last seen alive on the morning of May 15, 1982, walking to her job at Remax Realtors in Elmhurst. The State presented evidence that her skeletonized remains were found on October 20, 1982 in an undeveloped area of Clarendon Hills Cemetery. A physical anthropologist testified that her left nipple was missing. Wounds to her

ribs and breastbone indicated that she had been stabbed several times.

In his statement, the defendant told Beuke that in mid-May 1982 he and Gecht went out in the van, looking for a girl. When they did not find a girl, they stopped to eat and drink beer. At 7 a.m. the defendant went to sleep in the rear of the van. He later heard noises and saw that the van was parked in a cemetery. Looking out of the van, he saw Gecht near a tombstone stabbing a white woman. The defendant then walked over to Gecht and told him to return to the van. Five minutes later, Gecht returned to the van, holding a knife and a severed breast.

The fourth victim was Shui Mak. She was last seen alive at 1 a.m. on May 29, 1982, when she left her brother's car on Barrington Road. Her body was found several months later in a construction area in South Barrington, Illinois. The cause of her death was determined to be fractures to her skull and ribs.

According to the defendant, he was riding in the van with Gecht at 2 a.m. some time in late May 1982. After they spotted a woman at the side of the road, Gecht told the defendant to go to the rear of the van. The woman, who spoke with an Oriental accent, entered the van. Gecht drove for 15 or 20 minutes, then tapped twice on the floor. The defendant left the rear of the van with a knife and a roll of wire.

Gecht pulled the woman out of the van, punched her in the face and ribs, and dragged her to some bushes. The defendant held a wire around her neck while Gecht cut her breasts. Gecht then told the defendant to get a jagged-edged knife from the van. When the defendant returned with the knife, Gecht had his penis in the woman's chest wounds. Gecht then took the knife from the defendant and used it to repeatedly cut the woman's ab-

domen. Feeling nauseated, the defendant returned to the van. Gecht soon returned and they drove away together.

The fifth victim was Sandra Delaware. On August 27, 1982, her body was found under the Fullerton Avenue Bridge at the Chicago River. Her wrists and ankles were bound with shoelaces and a ligature was around her neck. An autopsy revealed that the cause of her death was ligature strangulation and an abdominal stab wound which penetrated her liver.

According to the defendant, he and Gecht were driving in the van on August 27, 1982, looking for a prostitute. When they were near North Avenue and the Chicago River, Gecht told the defendant to get into the rear of the van. A black woman entered the van and spoke with Gecht about sex. The van stopped and the defendant heard two taps. He left the van holding a knife and met Gecht at the front passenger door.

Gecht pulled the woman out of the van, removed her clothes, and handcuffed her while the defendant held her arms. Gecht then had vaginal intercourse with the woman while she performed an oral sex act on the defendant. Gecht asked the defendant if he was "having fun." The defendant replied: "No." Gecht then asked the defendant what he was going to do about it. The defendant then stabbed the woman twice in the chest with his pocket knife. Feeling nauseated, he returned to the van. Gecht then returned to the van with the handcuffs and the knife.

The sixth and seventh victims were Rafael Tirado and Alberto Rosario. They were both shot on October 6, 1982, while standing near the corner of Damen and Lemoyne in Chicago. Rosario was taken to the hospital and survived. Tirado, shot once in the head and once in the neck, died from these wounds.

According to the defendant, on October 6, 1982, the defendant was driving the van with Gecht near North

Avenue and Damen Street, when they saw three men near a phone booth. Gecht told the defendant, who was driving, to slow down. Gecht then took a .38-caliber pistol and a rifle from the rear of the van and told the defendant to stop. Gecht then fired several shots with the pistol and the rifle and told the defendant to drive away.

The eighth victim was Beverly Washington. On the same day as the shooting of Tirado and Rosario, and shortly after it, Gecht told the defendant to get into the rear of the van. Gecht again picked up a woman. The defendant heard two taps and met Gecht at the passenger door. The woman was "high" and they removed her clothes. Under a bridge near some railroad tracks, Gecht cut off one of her breasts and placed his penis in the wound. The defendant took a jagged-edged knife from the van and gave it to Gecht. He then returned to the van. Ten minutes later, Gecht returned and they drove away.

In his second statement, given to Assistant State's Attorney Beuke on November 8, 1982, the defendant contradicted his earlier assertions about the murders in several respects. As was stated earlier, he implicated Andrew Kokoraleis in the murder of Linda Sutton. He also stated that Kokoraleis accompanied Gecht and the defendant when Lorraine Borowski and Shui Mak were killed. The defendant also stated that it was Kokoraleis, and not Gecht, who was present when the unidentified woman was killed in August of 1981. Finally, according to this statement, it was Kokoraleis, and not Gecht, who shot Tirado and Rosario. Prior to the shooting, Kokoraleis, the defendant, and Gecht, had discussed "getting some niggers." As in the defendant's first statement, the defendant drove the van, but it was Kokoraleis who was the passenger, while Gecht followed the van in a car.

In a third statement, also given to Assistant State's Attorney Beuke on November 8, 1982, the defendant admitted his participation in the killing of Rose Beck Davis.

On September 8, 1982, the body of Rose Beck Davis was found between two buildings on Lake Shore Drive in Chicago. A stocking was tied around her neck, and her breasts were slashed. She had multiple skull fractures. A four-inch piece of wood was removed from her vagina, which had been lacerated. The cause of death was strangulation.

The defendant stated to Beuke that he and Andrew Kokoraleis pulled the victim into a van driven by Gecht. She was taken to a courtway near the lakefront. While Gecht raped her and cut her chest with a small axe, the defendant held a stocking around her neck and strangled her. After she stopped breathing the defendant became nauseated and returned to the van.

Rose Sweet, a woman who had known the defendant for six or seven years, testified to the following incident. She saw the defendant filling a gasoline can with gas. She told him that she did not feel comfortable with him filling the can "because if something were to happen, he would be a sissy and run, and other people would suffer the consequences." The defendant replied that he was not a "sissy" and that he had "killed somebody before." He went on to say that he had killed a "couple of broads," that he had "cut their tit off," and that it was "very messy."

The defendant presented the following evidence in mitigation.

The defendant's mother, Mrs. Judith Gajewski, gave birth to the defendant at age 16. She testified that the defendant's father treated the defendant very poorly as a child. He ignored the defendant because the defendant

was "slow." Mrs. Gajewski divorced the defendant's father when the defendant was seven.

The defendant was made to repeat kindergarten because he was not mature enough to advance to the first grade. Mrs. Gajewski described him as shy, withdrawn, and without friends. His grades in school were very poor. He preferred helping the janitor sweep the floor to attending classes.

Eleanor Pupa, a close friend of the defendant's mother, testified that she had known the defendant since he was 10 years old. She described him as a shy, backward, pathetic child, who she always felt was being punished and "whipped" a lot. Albert Zaucha, the defendant's classmate in the fourth through eighth grades, described the defendant as a "slow, weird, uncoordinated" kid, who did not stand up for himself, often "got beat up," and cried a great deal.

One of the defendant's teachers in seventh grade, Father George Jendrach, described the defendant as docile, cooperative, and extremely slow. Because of his poor grades, the defendant was not accepted into the local Catholic or vocational high school.

The defendant's younger sister, Jennifer Moraetes, testified that she and the defendant were in the same level throughout grammar school. She described him as "very slow" in school. The other students often "picked on" him and made fun of him. She tutored him, helping him to graduate from eighth grade.

The defendant's mother, Mrs. Gajewski, remarried when the defendant was 12. She described the defendant's stepfather as a stern man, who nevertheless treated the defendant with compassion, but could not give him a father's love. Eleanor Pupa described the defendant's stepfather as "a good man, but very, very strict."

Robert Hecker, who had been the assistant principal at Fenger Public High School when the defendant was a freshman, testified that the defendant's attendance was very poor. He failed all of his classes. At the start of his second year, despite counselling with his parents, the defendant "completely fell apart" and again passed no courses. He did not return to high school for his third year.

When the defendant was 18 he had an accident in the family car and was told by his stepfather to move out of the house. He then lived with his father for a while, and later with his grandmother, until she also told him to leave. He then moved from friend to friend, "making the rounds."

William Rudnick, who lived one house away from defendant's parents, had known the defendant for 12 years. When the defendant lived at his parent's home, he and Rudnick walked their dogs together three times a week. Rudnick described the defendant as "slow in intelligence" and courteous. When the defendant was 18, Rudnick encouraged him to learn a trade.

The defendant attempted to work in his stepfather's scrap iron business, but quit when the work proved too strenuous. He then worked at Burger King and Winchell's Donuts, before finally taking a job with Robin Gecht, who was an electrician. He told others that he enjoyed working for Gecht because he was learning skills. When the defendant later told Rudnick that he had gotten a job with an electrical contractor, Rudnick congratulated him and told him to "stick with it." The defendant also told his sister, Jennifer Moraetes, about the job with Gecht. She congratulated him and testified that she felt good that he had found a job with a future. She told him to "get all he could" out of the job with Gecht.

After the defendant's arrest, the defendant's mother and sister both visited him at Stateville penitentiary. Ms.

Moraetes described him as "scared but trying to be comfortable." She saw no difference in his personality since 1980; he was still "calm, friendly, weak, and slow."

The defendant also offered the testimony of clinical psychologist Kent Mohr. In 1986 Mohr visited the defendant in jail and administered a series of diagnostic tests. Mohr testified that the defendant's I.Q. was 76, which put the defendant in the seventh percentile of population. The defendant's intellectual ability was "borderline defective."

Mohr diagnosed the defendant as a "schizoid personality." He had basic feelings of inadequacy and insecurity and related to people in a very inferior, withdrawn way. The defendant responded to his environment in a very impulsive manner, lacking the ability to weigh details and evaluate their relative importance. In new or unique situations the defendant would be immobilized or respond in a very immature way. He was likely to follow other people's directions as to what to do. His was a basically passive personality, dependant on others. He did, however, have an underlying anger and a potential for explosiveness which could be dangerous.

The defendant also testified in his own behalf. He stated that he did not know beforehand that Gecht planned to murder Linda Sutton. According to the defendant, Gecht was supposed to drive the defendant to Chicago to pick up some tools and then drive the defendant back to Winchell's Donuts to fix his car. Later that night, when Gecht took Sutton into the bushes and the defendant heard her moaning, he felt scared and did not know what to do. He admitted, however, that he did not call the police or an ambulance when he saw Sutton lying on the ground bleeding. He explained that he took the wire from the van and severed Sutton's breast because Gecht told him to do it.

The defendant claimed that in the weeks following the murder of Sutton, he tried to avoid Gecht, who kept urging the defendant to go "driving around" with Gecht. After repeatedly refusing, the defendant finally agreed. On these excursions, he and Gecht would pick up prostitutes; many times Gecht would merely have sex with them.

During this period Gecht offered the defendant a job in Gecht's electrical business. The defendant accepted because he wanted to learn a trade.

The defendant explained that he continued to associate with Gecht despite the killings because he wanted to keep his job and continue learning a trade. He enjoyed working although, because of the murders, he "knew he was in deep trouble." At that time, the defendant was 20 years old and Gecht was 28 or 29. Admitting that he never did anything to stop the murders, the defendant claimed that he felt very guilty about his participation in them.

The defendant had been incarcerated at Stateville since 1984, where he worked repairing engines and cutting grass. He was visited by his family and a couple of friends and had no disciplinary problems.

The defendant makes the following claims of error with respect to his sentence: (1) that the prosecutor deprived the defendant of a fair sentencing hearing by cross-examining him about "devil worshipping," in violation of a stipulation against such examination; (2) that the prosecutor deprived the defendant of a fair trial by statements in summation which: (a) referred to the victims' families, (b) attempted to elicit sympathy for the victims, (c) appealed to the fears of the jurors, (d) argued that the defendant was racially prejudiced against blacks, Asians, and Hispanics, (e) attempted to dehumanize the defendant in the eyes of the jurors, (f) misstated the applicable burden of proof, and (g) speculated as to

the personality traits and character of the defendant and Robin Gecht; (3) that the trial court erred by refusing an instruction tendered by the defendant which would have told the jury to consider as mitigating the hypothesis that the defendant's criminal conduct was induced or facilitated by another; (4) that the trial court erred by instructing the jury that its decision about the death penalty should not be influenced by sympathy; (5) that the trial court erred by refusing to allow evidence of the mandatory alternative sentence of natural life imprisonment; (6) that the trial court erred by refusing to consider evidence that the Du Page County State's Attorney applied the death penalty in an unconstitutionally arbitrary manner; (7) that the Illinois death penalty statute is unconstitutional because it gives Illinois State's Attorneys unlimited and unguided discretion to choose which defendants among those convicted of capital murder will be subject to the death penalty; (8) that the Illinois death penalty is unconstitutional because, under its aegis, death penalties are imposed more frequently for the killings of whites than for the killings of blacks; (9) that the Illinois death penalty statute violates due process and equal protection because it fails to adequately narrow those persons eligible for death to a unique and cognizable group; (10) that the Illinois death penalty statute is unconstitutional because it does not contain adequate safeguards to prevent arbitrary or capricious imposition of death sentences; and (11) that the Illinois death penalty statute is unconstitutional because it limits the imposition of death to defendants who do not require special provisions or assistance.

The defendant first alleges a number of instances of prosecutorial misconduct, most of them in summation. The vast majority of these errors were not the subject of contemporaneous objections, although most of them, including all of the alleged summation errors, were raised

in the defendant's motion for a new sentencing hearing. As will be shown, some, but not all, of the prosecutorial statements challenged are instances of genuine error. We need not reach the argument that these errors have been waived, however, or if they are "plain error," because we find that they did not, either singly or cumulatively, so infect the sentencing hearing with unfairness as to make the resulting death sentence a denial of due process. See *Darden v. Wainwright* (1986), 477 U.S. 168, 91 L. Ed. 2d 144, 106 S. Ct. 2464.

The defendant first argues that the prosecutor was guilty of misconduct when he violated a stipulation agreed upon by the prosecution and the defense prior to trial. Prior to the commencement of the death penalty hearing, the defendant had moved *in limine* to bar evidence of his alleged membership with Robin Gecht and others in a "religious cult" in which ritualistic ceremonies were performed with amputated human breasts in Gecht's attic. The prosecutor agreed to the motion and stipulated that the State would offer no such evidence. During the sentencing hearing, the defendant testified that he felt remorse during and after the killings and that he would eventually have gone to the police. On cross-examination the prosecutor asked the defendant, without objection, whether he had ever taken any of the severed breasts up to Gecht's attic and whether he had ever been involved in "Devil Worshipping." The defendant answered "no" to both questions.

While conceding that evidence of devil worship might have been relevant to the second phase of the sentencing hearing, the defendant contends that the prosecutor's stipulation precluded any questioning about this subject. In response, the prosecution contends that the defendant opened the door to this line of questioning by claiming that he would have gone to the police.

We agree with the defendant that this reference constituted prosecutorial misconduct. The mere fact that the defendant claimed he would have eventually informed the police did not justify the violation by the prosecution of its own agreement not to raise the issue of devil worship. However, we note the prosecution's argument that this issue was waived by the defendant's failure to raise it at any time prior to this appeal.

The defendant next argues that the prosecutor in his summation improperly dwelled on the victims and their families. The prosecutor stated on summation:

"Eight human beings—Dan said it. I won't say it again, viciously and randomly selected. Lives of their own. Walking down the street. Plucked away from their families, never to be seen again. ***

And (the defendant's mother) also told you about jail, and I think you got a little telling insight into it. She visits him at jail. Jail is just fine. He watches T.V. He reads magazines. He's got the run of the place, a nice cell mate, calls his mother everyday. He likes jail. Jail is okay with him.

Do you think Lori Borowski would like to watch T.V. today? Do you think Shui Mak would like to read a few magazines today? Do you think their mothers would like to call them on the phone everyday?

They want you to send him back to the country club. Send him back to jail where he's happy. What do you think the families would think of that? *** There are so many victims in this case, there is a tendency to forget they were people, and there is a tendency to forget they had lives and they had dreams and they had hopes and they had families. And as Dan said before, they didn't do anything to deserve this. Nothing."

In a related series of remarks, the prosecutor repeatedly referred to victims:

"You heard a lot about this case, poor Ed, poor Ed's rights. He is sitting in the little room with a little window.

What about Lori Borowski's rights? What about Rose Beck Davises' rights. What about Sandra Delaware's rights. Those individuals have rights too, and as jurors, we ask you to consider their rights.

What about their right to have a future, to have families, to get married and have kids? They had a right to those lives on that day, and he gave them the death sentence every time he went out with his buddies."

We agree with the defendant that these statements were improper. Under *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, references to the crime's impact upon the victim and the victim's family are prejudicial because they tend to distract the jury from its proper focus upon the character of the defendant and the circumstances of the crime.

However, these statements do not rise to the level of error which is so prejudicial as to affect the overall fairness of the sentencing hearing. The prosecution's references to the victims and to the families of the victims were general and vague. Unlike the situation in *People v. Simms* (1988), 121 Ill. 2d 259, where the prosecution presented copious evidence of bereavement, here no family member actually testified.

The defendant next argues error as to a series of remarks which supposedly "appealed to the fears of the jurors." In one remarkable passage, the prosecutor asked the jurors to put themselves "in the shoes" of the victims and to imagine their feelings:

"Think of it. You, any of us walking down a street, being grabbed by one, two or three individuals like this man, who have one intent, to kill somebody, to kill you.
\*\*\*

Please attempt to place yourselves in the shoes of Linda Sutton, in the shoes of Lori Borowski, in the shoes of Sandra Delaware, in the shoes of Rose Beck Davis, in the shoes of Shui Mak, in the shoes of Rafael Tirado, in the shoes of Beverly Washington, and into the shoes of

these other two unknown victims that we still haven't found.

Place yourself in their shoes and think what they must have been thinking about at the time they were murdered. ***

Place yourself in the shoes of these individuals at the time this started occurring to them.

What went through their minds when they were shot, stabbed, mutilated, handcuffed."

The State does not attempt to defend these remarks, and we agree with the defendant that they were highly improper. The State was free to argue, as it did, that the incredibly cold-blooded and horrific way in which these crimes were planned and executed made the defendant a fit subject for retribution. The State was not free, however, to invite the jurors to enter into some sort of empathetic identification with the victims. We agree with the State, however, that these remarks also were not so prejudicial as to deprive the defendant of a fair sentencing hearing.

Along the same lines, the defendant also cites the argument that "the people in your community have a right to live free from the fear of guys like Edward Spreitzer." An objection to this statement was overruled, and it was raised in the defendant's post-trial motion. Had this remark been an attempt to suggest, like the similar remarks in *People v. Szabo* (1983), 94 Ill. 2d 327, that the jury was to speculate on the possibility that Spreitzer might eventually be freed, it would have been clearly improper. However, the remark could also be interpreted as a proper invocation of the State's legitimate interest in deterring "guys like" the defendant from committing similar crimes. We therefore do not find that it deprived the defendant of a fair sentencing hearing.

The defendant next argues that the prosecutor erred by arguing to the jury that the defendant was racially bi-

ased against blacks, Asians, and Hispanics. We do not agree. The prosecutor's remarks were fairly based upon the evidence, particularly the defendant's admission that the shootings of Tirado and Rosario were motivated by the defendant's desire to "get some niggers."

The defendant next argues that he was prejudiced by the prosecutor's remark that he "should not be considered human," and that to call him "an animal or names would be an insult to the animals, and I won't do that." This court has repeatedly disapproved of similar remarks (see *People v. Tiller* (1982), 94 Ill. 2d 303; *People v. Elder* (1962), 25 Ill. 2d 612), but has generally declined to reverse without some indication that they have resulted in substantial prejudice to the accused. We do not find any substantial prejudice to the accused in this instance.

The defendant next argues, and the prosecutor concedes, that it was error for the prosecutor to claim in summation that the defendant had the burden to prove mitigating factors sufficient to preclude death, and that if they found no mitigating factors, the defendant should be sentenced to death. Since, however, the jury was properly instructed as to burden of proof, we decline to reverse on this ground.

Lastly, the defendant argues that he was prejudiced by the prosecutor's comments regarding the intellectual and moral qualities of Robin Gecht. In response to the defendant's argument that Spreitzer was the stupid and cowardly dupe of Gecht, the prosecutor responded that Gecht was also stupid and cowardly. We believe that this comment was a fair inference from the evidence in the case, and we see no support for the defendant's contention that the jury could have been led to believe that the prosecutor was basing his comments upon some private information about Gecht which had not been introduced into evidence.

The defendant next argues that the trial court erred by refusing to instruct the jury that nonstatutory mitigating factors could include the fact that "the Defendant's criminal conduct was induced or facilitated by someone other than the Defendant." Instead the trial court instructed the jury:

"Mitigating factors are any facts or circumstances that provide reasons for imposing a sentence less than the death penalty. Mitigating factors include that: the defendant has no significant history of prior criminal activity; or the defendant was not personally present during the commission of the act or acts causing death; or the defendant may be rehabilitated or restored to useful citizenship; *or any other facts or circumstances that provide reasons for imposing less than the most severe sentence.*" (Emphasis added.)

The defendant argues, on the basis of *People v. Davis* (1983), 95 Ill. 2d 1, that it is improper to refuse such an instruction on the sole ground that the mitigating factor is not listed as mitigating in the death penalty statute. The defendant's argument mistakes *dictum* in *Davis* for holding. While the court in *Davis* stated its belief that "the trial judge's reason for refusing the instruction was improper" (95 Ill. 2d at 49), it went on to hold that where "the instruction requires the jury to consider all mitigating factors, the dictates of *Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954, are satisfied." (95 Ill. 2d at 50.) In fact this court has repeatedly held that a defendant's request for an instruction on nonstatutory mitigation may properly be refused so long as the court charges the jury that they are to consider "any other facts or circumstances that provide reasons for imposing less than [the most severe sentence]." (*People v. Sanchez* (1986), 115 Ill. 2d 238, 269-70; *People v. Stewart* (1984), 105 Ill. 2d 22, 70; *People v. Free* (1983),

94 Ill. 2d 419-20.) The defendant, without making any specific arguments, asks us to reconsider these holdings.

This we decline to do. While nothing we have previously said precludes a trial court from instructing on specific examples of nonstatutory mitigation, a requirement that the trial court charge every possible nonstatutory mitigating factor would be both unwieldy and unworkable. Under the Federal Constitution, mitigating factors include "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (*Lockett v. Ohio* (1978), 438 U.S. 586, 604, 57 L. Ed. 2d 973, 990, 98 S. Ct. 2954, 2964-65.) In other words, any circumstance which suggests that the death penalty would not serve the community's interest in deterrence or retribution is potentially mitigating. While the number of such possible mitigating factors is not infinite, it is certainly extremely large. Any listing of such factors which is presented to the jury will always be open to the objections that it is incomplete and that it will tend to mislead the jury into thinking that they must limit themselves to the factors actually listed. Rather than requiring court and counsel to present the jury with a detailed laundry list of nonstatutory mitigation, we think it better to allow the court to instruct only on specific instances of statutory mitigation, while instructing the jury that they may consider any other nonstatutory mitigating factor.

The defendant next argues that the trial court erred by instructing the jury that "[n]either sympathy nor prejudice should influence you." This instruction has been upheld in many cases. (See *People v. Crews* (1988), 122 Ill. 2d 266; *People v. Emerson* (1987), 122 Ill. 2d 411; *People v. Johnson* (1987), 119 Ill. 2d 119, 150; *People v. Lego* (1987), 116 Ill. 2d 323, 350; *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 445; *People v. Stewart*

(1984), 104 Ill. 2d 463, 494.) While acknowledging these holdings, the defendant argues that they have been invalidated by *California v. Brown* (1987), 479 U.S. 538, 93 L. Ed. 2d 934, 107 S. Ct. 837. In *Brown*, the United States Supreme Court upheld an instruction which told the jurors that they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling." The Court held that such an instruction was not likely, for two reasons, to divert the jury from its constitutional duty to consider any sympathetic aspect of the defendant's character or record.

The Court first noted that the defendant "ignores the crucial fact that the jury was instructed to avoid basing its decision on *mere* sympathy. \*\*\* We think a reasonable juror would \*\*\* understand the instruction not to rely on 'mere sympathy' as a directive to ignore only the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase." (Emphasis in original.) (*Brown*, 479 U.S. at 542, 93 L. Ed. 2d at 940, 107 S. Ct. at 840.) Second, the Court noted that a reasonable juror was unlikely to "perversely single out the word 'sympathy' from the other nouns which accompany it in the instruction: conjecture, passion, prejudice, public opinion, and public feeling." *Brown*, 479 U.S. at 542-43, 93 L. Ed. 2d at 941, 107 S. Ct. at 840.

The defendant plausibly argues that the challenged instruction shares with the *Brown* instruction neither of these saving graces: the jury is not cautioned to avoid "mere" sympathy, and the word sympathy is not part of a long catalogue of the kind of factors which would improperly influence a juror's decision to vote for or against the death penalty. (For a similar argument see *Johnson v. Oklahoma* (1987), 484 U.S. 878, 98 L. Ed. 2d 167, 108 S. Ct. 35 (Marshall, J., dissenting from denial of *certiorari*, joined by Brennan, J.).) However, the defendant fails to note the full text of the instruction:

"Neither sympathy nor prejudice should influence you. You should not be influenced by any person's race, color, religion, or national ancestry." (Illinois Pattern Jury Instructions, Criminal, No. 1.01(5) (2d ed. 1981).) We believe that the placement of the words "sympathy and prejudice" in close proximity to the obviously improper factors of race, color, and religion would sufficiently alert a reasonable juror that he is being asked only to avoid knee-jerk, "gut" reactions to aggravating or mitigating evidence and is not precluded from a "reasoned *moral* response to the defendant's background, character, and crime." (Emphasis in original.) (*Brown*, 479 U.S. at 545, 93 L. Ed. 2d at 942, 107 S. Ct. at 841 (O'Connor, J., concurring).) We therefore decline, in the absence of action by the United States Supreme Court, to overrule our prior decisions in this matter.

The defendant next argues that the trial court's refusal to allow evidence: (1) that the defendant was already serving four natural life sentences, and (2) that the defendant, if spared the death penalty, would be automatically sentenced to imprisonment for his natural life, combined with the failure of defendant's counsel to offer an instruction on the mandatory alternative, deprived the defendant of a fair sentencing hearing. The defendant also points to the effect of remarks by the prosecutor which suggested that the defendant was still dangerous and that the death penalty was necessary to safeguard the community from his future ravages. At the time of the sentencing hearing, it was the law of Illinois that the trial court was not required to instruct a jury on the alternative mandatory sentence of natural life. (*People v. Albanese* (1984), 102 Ill. 2d 54, 81; *People v. Stewart* (1984), 105 Ill. 2d 22, 70-71.) We have now held that such an instruction is required. (*People v. Gacho* (1988), 122 Ill. 2d 221, 260.) However, since the *Gacho* rule applies only prospectively to sentencing hear-

ings conducted after the date of the decision in this case, *Gacho* is inapplicable, and the trial court's failure to permit evidence of sentencing alternatives was not error. Likewise, the failure of defense counsel to tender such an instruction was not incompetent, for the obvious reason that the trial court could properly have refused such an instruction prior to our decision in *Gacho*.

The defendant next argues the trial court erred by refusing to allow the defendant to present evidence that the Du Page County State's Attorney arbitrarily and capriciously requested a death penalty hearing in his case. More specifically the defendant claims that if allowed the opportunity he would have proved that at the time of the offense for which the State was seeking death the policy of the Du Page County State's Attorney's office had been to seek a death penalty hearing in some but not all death-eligible cases; but that by the time the State requested a death penalty hearing that office had changed its policy and required prosecutors to request death hearings in every death-eligible case. This contention is similar to the claims of variance in policy among different State's Attorney's offices which we have already rejected (see *People v. Stewart* (1988), 121 Ill. 2d 93), and we see no need to reach a different result here.

The defendant next argues that our death penalty statute is unconstitutional because it gives prosecutors unlimited discretion to seek the death penalty for those defendants convicted of capital murder. This, of course, is the argument rejected by a four-member majority of this court in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, and by a six-member majority in *People v. Lewis* (1981), 88 Ill. 2d 129. The defendant's only basis for seeking to overturn these precedents is the fact that a Federal district court judge has recently reviewed a *habeas* petition which raises a similar challenge and, while granting the petition on another ground, has ex-

pressed doubts about the facial constitutionality of our statute. (*United States ex rel. Lewis v. Lane* (C.D. Ill. 1987), 656 F. Supp. 181, *aff'd* (7th Cir. 1987), 832 F.2d 1446.) His doubts parallel the reasoning put forward by the three dissenters in *Cousins* (77 Ill. 2d at 544-61 (Goldenhersh, C.J., and Ryan and Clark, JJ., dissenting)), and by the single dissenter in *Lewis* (88 Ill. 2d at 179 (Simon, J., dissenting)). Noting that two members of the *Cousins* minority later expressed the hope that a Federal court would review our statute (see *Lewis*, 88 Ill. 2d at 166, 167 (Goldenhersh, C.J., and Ryan and Clark, JJ., concurring)), the defendant argues that the *dicta* expressed in *Lewis v. Lane* should prompt us to reexamine our own holdings in *Lewis* and *Cousins*. We do not agree.

While we welcome Federal review of our statute, we do not believe that opinions expressed by lower Federal court judges, standing alone, are sufficient to support reconsideration of our holdings in *Lewis* and *Cousins*. It is clear that the challenge to the constitutionality of our statute raised in those cases was neither frivolous nor implausible. It is therefore not surprising that a Federal judge should entertain "grave doubts" as to our statute's constitutionality. But these doubts cannot by themselves dictate the overruling of *Cousins* and *Lewis*. Federal court judges are no more or less competent to interpret the Federal Constitution than State court judges. Absent a binding decision by the United States Supreme Court, mere controversy over the validity of our prior holdings is not a sufficient ground to break with *stare decisis* and overrule them.

The defendant next argues that the application of our death penalty statute is unconstitutional because, under its aegis, killers of whites are six times more likely to receive the death penalty than killers of blacks. This argument has now been rejected, both by the United States

Supreme Court (*McCleskey v. Kemp* (1987), 481 U.S. 279, 95 L. Ed. 2d 262, 107 S. Ct. 1756), and by our court (*People v. Davis* (1987), 119 Ill. 2d 61; see also *People v. Orange* (1988), 121 Ill. 2d 364; *People v. Stewart* (1988), 121 Ill. 2d 93). The authority cited by the defendant for this argument, a study by Professors Samuel Gross and Robert Mauro (see Gross & Mauro, *Patterns of Death: An Analysis of Racial Disparities in Capital Sentencing & Homicide Victimization*, 37 Stan. L. Rev. 27 (1984)) has already been discussed in *Davis*, and there is no need to repeat that discussion here. We therefore find no merit in this argument.

The defendant next argues that the Illinois death penalty statute is unconstitutional because it fails adequately to distinguish between persons eligible for the death penalty and persons eligible for a sentence of life imprisonment under the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1). Since this case was briefed, this argument too has been rejected (see *People v. Emerson* (1987), 122 Ill. 2d 411; *People v. Whitehead* (1987), 116 Ill. 2d 425), and we see no need to reconsider it here.

The defendant next raises a number of claims with respect to the facial constitutionality of our death penalty statute. All of these claims have been reviewed, and rejected, in previous cases. Our court has previously held that our death statute is not rendered unconstitutional because of: the lack of formal comparative proportionality review (*People v. Brownell* (1980), 79 Ill. 2d 508); the absence of a requirement for written findings by the sentencer (*People v. Gaines* (1981), 88 Ill. 2d 342); inadequate pretrial notice of aggravating factors (*People v. Davis* (1983), 95 Ill. 2d 1); the absence of a requirement that the jury explicitly find death to be the appropriate sentence (*People v. Free* (1983), 94 Ill. 2d 378); and statutory language which allegedly allows the sentencer to

place the burden of proof upon the defendant (*People v. Del Vecchio* (1985), 105 Ill. 2d 414). The defendant's sole ground for urging reconsideration appears to be that a single justice of the United States Supreme Court, with whom a second justice concurs, has dissented from denials of *certiorari* in a number of our cases, and has stated in those dissents that the Illinois statute is unconstitutional. (See *Albanese v. Illinois* (1985), 471 U.S. 1044, 1044-45, 85 L. Ed. 2d 335, 335-36, 105 S. Ct. 2061, 2061-62 (Marshall, J., dissenting from denial of *certiorari*, joined by Brennan, J.); *Gacy v. Illinois* (1985), 470 U.S. 1037, 1037-38, 84 L. Ed. 2d 799, 799, 105 S. Ct. 1410, 1410-11 (Marshall, J., dissenting from denial of *certiorari*, joined by Brennan, J.); *Eddmonds v. Illinois* (1984), 469 U.S. 894, 895-98, 83 L. Ed. 2d 207, 208-10, 105 S. Ct. 271, 271-74 (Marshall, J., dissenting from denial of *certiorari*, joined by Brennan, J.); *Jones v. Illinois* (1983), 464 U.S. 920, 920-21, 78 L. Ed. 2d 264, 264-65, 104 S. Ct. 287, 287-88 (Marshall, J., dissenting from denial of *certiorari*, joined by Brennan, J.).) While opinions which express the views of two Supreme Court justices may have some persuasive value, they are not, without more, an adequate ground for the reconsideration of binding precedent.

The defendant's penultimate argument is that the Illinois death penalty statute is unconstitutional because it exempts from the death penalty persons who require special provisions or assistance in order to be fit to stand trial. (See Ill. Rev. Stat. 1985, ch. 38, pars. 104—22, 104—26(b).) This argument has been rejected many times (see, *e.g., People v. Ashford* (1988), 121 Ill. 2d 55; *People v. Emerson* (1987), 122 Ill. 2d 411; *People v. Whitehead* (1987), 116 Ill. 2d 425, 460-62; *People v. Johnson* (1986), 114 Ill. 2d 170, 208; *People v. Stewart* (1984), 104 Ill. 2d 463, 499-502), and we see no need to reconsider it here.

Lastly, the defendant argues, and the State concedes, that the defendant was improperly sentenced to an extended term of 60 years' imprisonment for aggravated kidnapping. Aggravated kidnapping (Ill. Rev. Stat. 1985, ch. 38, par. 10—2(a)(3)) is, in fact, a Class I felony for which the maximum extended term is not 60 years, but 30 years. Ill. Rev. Stat. 1985, ch. 38, pars. 10—2(b)(2), 1005—8—2(a)(3).

For the foregoing reasons, the defendant's convictions and his sentence of death are affirmed, and the defendant's sentence of 60 years' imprisonment for aggravated kidnapping is reduced to 30 years. The clerk of this court is directed to set an order setting Tuesday, September 13, 1988, as the date on which the sentence of death entered in the circuit court is to be implemented. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*Judgment affirmed*
*as modified.*