THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM DeBUSK *et al.*, Defendants-Appellants.

First District (3rd Division)   Nos. 1—87—3699, 1—88—0312 cons.

Opinion filed June 10, 1992.

Randolph N. Stone, Public Defender, of Chicago (Barbara McClure, Assistant Public Defender, of counsel), for appellant William DeBusk.

Alan D. Goldberg and David Goldwin, both of State Appellate Defender's Office, of Chicago, for appellant Edward Shriner.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Joseph Brent, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

After a joint jury trial, codefendants, William DeBusk and Edward Shriner, were convicted of home invasion (Ill. Rev. Stat. 1985, ch. 38, par. 12—11) and armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2). DeBusk was sentenced to 25 years' imprisonment, and Shriner was sentenced as an habitual offender to a term of natural life in prison. On appeal, Shriner asserts that (1) the trial court erred in not granting defense counsel's request that another attorney be appointed to represent him due to a conflict of interest; (2) he was denied his sixth amendment right to self-representation when the trial court refused to allow him to proceed *pro se* during the hearing on the pretrial motions; (3) he was denied a fair trial due to numerous implications of prior criminal conduct; (4) his conviction must be reversed because the jury instructions for armed robbery omitted a mental state, which is an essential element of the crime; (5) he was improperly sentenced to natural life imprisonment because the Federal bank robbery statute used as a predicate offense requires proof of only an attempted armed robbery and is therefore not equivalent to an Illinois Class X offense; (6) he was denied his right to counsel at the habitual offender hearing because there was no valid waiver of counsel; (7) the finding of habitual criminality against him must be reversed because the State failed to prove that the second predicate offense was committed after his first conviction; (8) the habitual criminal statute is unconstitutional because it violates the United States Constitution's due process clause, eighth amendment, and separation of powers doctrine; and (9) the habitual criminal statute is unconstitutional because it violates the Illinois and United States Constitutions' prohibitions of *ex post facto* laws and double jeopardy.

Codefendant DeBusk asserts on appeal that he was denied a fair trial because (1) the jury instructions for armed robbery omitted a mental state, which is an essential element of the crime; (2) there were numerous implications of prior criminal conduct; (3) codefendant

Shriner used prejudicial *pro se* tactics; and (4) codefendant Shriner's persistent questions about the presence of a third intruder equaled an admission of his own and DeBusk's guilt. DeBusk also asserts that his trial was so prejudiced that it constituted plain error when codefendant Shriner's questions on cross-examination elicited details of the emotional trauma suffered by the victims. DeBusk later adopted Shriner's argument that the trial court erred in not granting defense counsel's request that another attorney be appointed to represent Shriner due to a conflict of interest.

Defendants were arrested on April 2, 1986, and jointly indicted for home invasion, two counts of armed robbery, residential burglary, two counts of armed violence, and unlawful restraint. Additionally, DeBusk was charged with unlawful use of a weapon. The State nol-prossed all the charges except home invasion and two counts of armed robbery before the trial began. After trial, a jury found both defendants guilty of home invasion and armed robbery. We affirm in part and reverse in part.

Prior to trial, defendants were jointly represented by assistant public defender Vincent Lufrano. On December 8, 1986, Lufrano informed the trial court that Shriner wanted to move for appointment of counsel other than the public defender. The trial court did not allow the motion to be made at that time. On January 22, 1987, and again on June 15, 1987, several months before the November 1987 trial, Lufrano requested that the public defender conflicts division be appointed to represent Shriner. Lufrano alleged that there was a conflict between defendants' defenses, that Shriner was exercising undue influence over DeBusk, that Shriner had made pretrial statements implicating DeBusk, and that there was evidence that was admissible against Shriner but not against DeBusk. Because both Shriner and DeBusk stated that they wanted the same attorney, the trial judge refused to appoint the conflicts division. Lufrano then made an oral motion requesting leave to withdraw, but the trial judge did not rule on the motion. Without elaboration, Lufrano represented to the trial judge that there were inconsistent and conflicting defenses for De-Busk.

On June 23, 1987, Lufrano again requested that the public defender conflicts division be assigned to Shriner because of his statement implicating DeBusk. After both Shriner and DeBusk objected to a severance, the State represented that Shriner's statement would not be used against DeBusk. Lufrano then stated that the sole basis of his motion concerned evidence that was admissible against Shriner that was not admissible against DeBusk.

At that time, Shriner requested a new attorney because of a conflict between him and Lufrano. When Lufrano represented that he would file a written motion for severance based on Shriner's influence over DeBusk, DeBusk stated that he understood his waiver and that he did not want a severance. Consequently, the trial court found that there were no substantial grounds presented for a new attorney.

Lufrano filed a motion for severance on July 7, 1987, alleging that Shriner exerted extreme and harmful influence over DeBusk, that Shriner had made statements implicating DeBusk, that there was evidence admissible against Shriner but not admissible against DeBusk, and that DeBusk could not raise the defense of compulsion. DeBusk stated that he did not want a severance and did not feel that his relationship with Shriner would deprive him of a fair trial. The trial judge denied the motion. Lufrano again requested that the conflicts division be appointed and the trial judge denied the request.

In a letter prior to September 21, 1987, Shriner informed the trial court that he intended to discharge his attorney. During his September 21, 1987, court appearance, Shriner requested to proceed *pro se*. After the court's admonishments, Shriner persisted in his request, but wanted co-counsel to assist him. Shriner then told the trial judge that he preferred an attorney other than the public defender. The trial court stated that his request was too late and ruled that Lufrano would represent both Shriner and DeBusk at the pretrial motions to quash arrest, suppress evidence, and suppress statements. The trial judge indicated that he would rule on Shriner's *pro se* motion after the pretrial motions had been determined. Lufrano again made an oral motion for severance, which the trial judge denied because neither Shriner nor DeBusk wanted it.

Shriner filed a *pro se* motion to quash arrest and suppress evidence. He requested that the trial court proceed on his motion instead of Lufrano's motion. After examining both motions, the trial court concluded that they were identical and then proceeded on Lufrano's motion.

At Lufrano's motion to quash arrest, Detective Michael R. Prunty of the Du Page County sheriff's department testified that on April 1, 1986, he and two other officers spoke to Dr. Salvador Berakus and his wife, Darlene, about a recent home invasion. The Berakuses gave Prunty a description of the two men as well as the license plate number and description of their getaway car. A check of the license plate's registration indicated that the car was registered to Terrence Maloney. When Prunty went to Maloney's residence, Maloney gave

him both defendants' names and address, stating that he loaned the car to them.

Prunty and two other detectives set up a surveillance of defendants' residence at 4 a.m. on April 2, 1986. An assistant State's Attorney approved arrest warrants for Shriner and DeBusk, and a Du Page County circuit court judge signed the warrants at 1:20 p.m.

Police officer Roland Libby testified that he received a phone message at 7:30 a.m. on April 2, 1986, which included a description of Shriner, DeBusk, and their car. At approximately 1:30 p.m. on April 2, 1986, Officer Tom Gurgle informed Libby that he was following defendants' car. At the intersection of 135th Street and Western Avenue, defendants were stopped by seven police cars. Libby testified that when he approached the stopped car, he saw three people in it, Shriner, DeBusk, and James Wedlaki. As Libby approached the car, he saw a blue athletic bag through the back hatchback window. The bag was open, and Libby saw the butt of a handgun protruding from the bag. After placing the three men under arrest, Libby seized the bag and recovered two guns.

Finding probable cause for the warrantless arrest, the trial court denied the motion to quash arrest. He also denied the motion to suppress evidence, finding that the search of the bag was lawful because it followed a lawful arrest. The subsequent motion to suppress Shriner's statements was granted. The trial court concluded that Shriner's statement was obtained after he requested an attorney.

Shriner then refiled his *pro se* motion to quash arrest and suppress evidence. Lufrano indicated that Shriner would stipulate to the evidence already heard by the court. Shriner's motion was similar to the one filed by Lufrano, except that it sought to suppress any evidence taken following Shriner's signing a consent to search form. The trial court denied Shriner's *pro se* motion to quash arrest and suppress evidence incident to that arrest, ruling that it already determined the same issues in Lufrano's motion. Because the State represented that it did not intend to introduce any evidence seized as a result of the consent to search form, the trial court concluded that it did not need to determine whether the seizure of the evidence was constitutional.

The trial court then admonished Shriner of his right to self-representation. Shriner requested that the court appoint a different assistant public defender to represent him. After the trial court denied his motion, Shriner elected to proceed *pro se*. Finding that Shriner was competent to represent himself, the trial court allowed Shriner to pro-

ceed *pro se* at trial, with assistant public defender Adrienne McFall as stand-by counsel.

Immediately prior to trial, Lufrano made an oral motion *in limine* to bar any reference to a Du Page County case that was pending against Shriner and DeBusk. A discussion followed where the assistant State's Attorney indicated that he did not intend to introduce evidence of the Du Page arrest or any other offenses. The trial court did not make a formal ruling on the motion.

At trial, Dwayne Rolando testified that at 7:45 p.m. on February 21, 1986, he was home with his wife, Celaine, and their granddaughter when he heard a loud knock on the side door of his Orland Park home. Leaving his wife and granddaughter in the study, he went to investigate. He saw an older man, whom he identified as Shriner, looking through the window, asking to buy gasoline. A mid-sized Ford was parked in the driveway.

When Rolando unlocked the interior door, Shriner opened the storm door. A younger man, whom Rolando identified as DeBusk, entered and pointed a shotgun in his face. Rolando testified that he backed up into the hallway and Shriner pointed a chrome-plated handgun at him. All the lights were on in that area of the house, and he could see both men. Nothing covered the men's faces and both wore gloves. At that time, Mrs. Rolando and their granddaughter entered the area. Shriner told them that no one would be hurt if they cooperated. Shriner ordered the Rolandos to face the wall. Initially, Rolando testified that four to six minutes passed from the time Shriner and DeBusk entered the house until he faced the wall, during which time he had a clear view of both men. Later, Rolando testified that it was only about two minutes.

Rolando further stated that Shriner demanded the Rolandos' wallets while DeBusk ran through the house. When DeBusk returned, Rolando told Shriner that there was $400 to $500 in an envelope on his desk in the study. DeBusk left and soon returned with the cash. Rolando testified that Shriner told them that times were hard and he "had to do this for a living."

Rolando further testified that the two men ordered them into the basement. As he turned away from the wall, Rolando saw both men's faces. Rolando estimated that they were in the kitchen for a total of about 15 minutes. Holding their weapons, Shriner and DeBusk took the Rolandos into the basement's back area, where one of the intruders tied up Mr. Rolando. Mrs. Rolando and their granddaughter were not tied up. As Shriner was leaving the basement, he told the Rolandos not to come upstairs for 20 to 25 minutes and he would kill

them if they did. Defendants turned off the light and went upstairs. Throughout the entire incident, Shriner had done all the talking.

From the basement window, Rolando saw DeBusk go in and out of the house to the Ford while carrying garbage bags. The driveway area was lit by the house and garage lights. After about 20 minutes, Rolando heard the car start. Shriner came to the basement door and told the Rolandos not to come up for 20 minutes. One or two minutes later, Rolando saw Shriner sneak out past the basement window. Rolando then ran to the barn to call the police. In response to Shriner's cross-examination, Rolando stated that no one was physically hurt, but there was mental anguish and suffering by all three victims, especially his granddaughter. In response to questions by Shriner, Rolando testified that there were only two intruders.

Missing after the incident were several hundred dollars in cash, a phone, two typewriters, a tape recorder, two attache cases, two cameras, a VCR remote control, a Sony television, a Magnavox VCR, three video tapes, a mink coat, silver and gold certificates, two pair of men's gloves, a corporate seal, miscellaneous jewelry, and rare coins. The Rolandos eventually recovered from police the VCR, the remote control, the television, the phone, the video tapes, the corporate seal, and the mink coat.

Shortly after defendants' arrests, Rolando testified, he viewed two lineups at a police station in Wheaton. At those lineups, Rolando positively identified Shriner and DeBusk. He also identified both defendants in court.

Lufrano then made a motion for a mistrial based on the testimony that the lineup was in Wheaton. The trial court denied the motion because there was no testimony indicating that any other charges were pending against either defendant.

Celaine Rolando's testimony was substantially the same as her husband's. She stated that the lighting was good and she could see both Shriner and DeBusk very well. She viewed them for four to five minutes before facing the wall.

Mrs. Rolando further testified that she viewed two lineups. On March 27, 1986, she viewed a lineup in Orland, where neither Shriner nor DeBusk was present. She did not identify anyone in that lineup. On April 3, 1986, she viewed a lineup in Du Page County. At that time, she identified both Shriner and DeBusk. She also identified them in court. Further, Mrs. Rolando testified that she identified her mink coat at the police station.

During cross-examination, Mrs. Rolando testified that she was emotionally injured although not physically injured. Mrs. Rolando also

stated that there were only two intruders, not three, as Shriner suggested.

Lufrano made a second motion for a mistrial due to the Rolandos' mention of the Du Page County lineups. The trial court denied both motions because there was no reference to any other arrests or crimes for which either defendant was charged.

Blue Island police officer Roland Libby testified that he arrested Shriner, DeBusk, and James Wedlaki in a blue Ford Escort at 1:30 p.m. on April 2, 1986. He also stated that he found a chrome handgun in a blue athletic bag in the rear of the car.

James Wedlaki testified that about a month prior to his arrest with defendants on April 2, 1986, Shriner gave him a mink coat with a name embroidered inside. Wedlaki took the embroidery out of the coat and hung the coat in his mother's closet.

Donald Smith testified that Shriner rented a room from him. Detective James Jordan testified that on April 2, 1986, Smith signed a consent to search his residence. When Smith indicated Shriner's room, Jordan sealed the bedroom without entering it. From the front room, he recovered a Sony television, whose serial number matched the serial number in the police report. He also recovered a Magnavox VCR, phone, and three VHS tapes from the front room. He later returned those items to the Rolandos.

Later that evening, Jordan spoke with Wedlaki in the Blue Island police station. After Wedlaki spoke to Shriner, Wedlaki took Jordan to his mother's house, where he gave Jordan a mink coat. Jordan was able to read Celaine Rolando's name on the inside of the coat where the stitching had been ripped out. During cross-examination, Jordan referred to the lineup that was held at another police facility.

The State then rested. Lufrano made a motion for a directed finding on behalf of DeBusk, and the trial court denied the motion. After a jury instruction conference, both Shriner and DeBusk rested. Closing arguments were heard and the jury was instructed. Following deliberations, the jury found both Shriner and DeBusk guilty of home invasion and two counts of armed robbery.

On November 30, 1987, the trial judge admonished Shriner as to his right to be represented by an attorney in the post-trial proceedings, and Shriner requested an attorney other than a public defender. The trial court stated that he would have to show a substantial reason why counsel other than the public defender should be appointed. Shriner also filed *pro se* motions for a continuance of the sentencing hearing and extension for filing post-trial motions. The trial court granted those motions.

On December 7, 1987, Shriner stated that he wanted to represent himself after the trial judge asked him if he was representing himself or wanted the assistant public defender as his attorney. After arguments, the trial court denied Shriner's post-trial motion. The State then filed a verified motion to sentence Shriner as an habitual criminal. (Ill. Rev. Stat. 1987, ch. 38, par. 33B(1).) The State reminded the trial court that Shriner was to be admonished regarding his right to counsel at an habitual criminal hearing. The trial court, however, did not make such an admonishment. Shriner did not admit the prior convictions, and the trial court granted the State's motion for a continuance for the sentencing hearing.

On January 14, 1988, Shriner filed *pro se* motions for decree of *nisi* and a new trial, which were denied. The sentencing hearings were then held. The trial court sentenced Shriner to a term of natural life imprisonment and DeBusk to 25 years' imprisonment.

■ On appeal, defendant Shriner asserts that the trial court erred in denying his attorney's motion that another attorney be appointed to represent him, thus depriving him of his sixth amendment right to conflict-free counsel. The State argues that Shriner waived this issue since he failed to raise it in his post-trial motion. Although Shriner did not include this issue in his *pro se* motion for a new trial, he asserted the issue in the trial court when his defense counsel moved four times for appointment of the public defender's conflicts division prior to the trial and when Shriner specifically requested counsel other than the public defender three times.

When the defendant fails to file a post-trial motion, the reviewing court will consider constitutional issues that have properly been raised at trial. (*People v. Enoch* (1988), 122 Ill. 2d 176, 190.) Moreover, if a claimed error potentially threatens a substantial right of the defendant, it can be considered under the plain error doctrine. (*People v. Moore* (1984), 128 Ill. App. 3d 505, 515.) Consequently, the issue is properly reviewed by this court.

Although requiring an attorney to represent codefendants with conflicting defenses denies the defendants their sixth amendment right to conflict-free counsel, it is not *per se* violative. (*Holloway v. Arkansas* (1978), 435 U.S. 475, 481-82, 55 L. Ed. 2d 426, 432-33, 98 S. Ct. 1173, 1177-78; *People v. Spreitzer* (1988), 123 Ill. 2d 1, 17.) Recently, the Illinois Supreme Court in *Spreitzer* explained that there are two different analyses depending on whether the trial court was ever apprised of the possible or potential conflict. (123 Ill. 2d at 17-18.) If counsel raises the potential conflict to the trial court's attention at an early stage, the trial court has a duty to ei-

ther appoint separate counsel or to take adequate steps to ascertain whether the risk of conflict was too remote to warrant separate counsel. (*Holloway*, 435 U.S. at 484, 55 L. Ed. 2d at 434, 98 S. Ct. at 1178, *Spreitzer*, 123 Ill. 2d at 18.) Reversal of a conviction under this rule does not require a showing that the attorney's actual performance was in any way affected by the purported conflict. (*Spreitzer*, 123 Ill. 2d at 18.) Prejudice is presumed regardless of whether it was independently shown. *Holloway*, 435 U.S. at 489, 55 L. Ed. 2d at 437, 98 S. Ct. at 1181.

In *Holloway*, the United States Supreme Court reversed the convictions because the trial court did not take adequate steps in response to counsel's repeated motions, objections, and representations of a probable conflict of interest, where no dilatory practices were present to justify that failure. (*Holloway*, 435 U.S. at 487, 55 L. Ed. 2d at 436, 98 S. Ct. at 1180.) Instead of taking adequate steps to ascertain whether the risk of a probable conflict was too great, the trial court cut off any opportunity of defense counsel to do more than make conclusory representations and did not even ask counsel to disclose the basis for his representations as to a conflict of interests. *Holloway*, 435 U.S. at 484 n.7, 55 L. Ed. 2d at 434 n.7, 98 S. Ct. at 1178 n.7.

■ Similarly, Shriner contends that the trial court refused to give any credence to his counsel's assertions that the possibility of conflicting defenses demonstrated a conflict of interest. Furthermore, Shriner argues that he would have suffered from the joint representation because he did not have his attorney's loyalty and would be represented by an attorney who was hostile to his interests.

We agree. Lufrano raised the issue of a potential conflict of interest at least four times several months before the trial. Although the trial court superficially inquired into Lufrano's reasons, no hearing was held concerning any possible conflicts. Based on objections by both Shriner and DeBusk, the trial court found that no actual conflict existed. That superficial inquiry was not adequate to determine whether there was a possible risk of a conflict. In addition, Shriner timely requested another attorney because of a conflict with Lufrano. Furthermore, asking DeBusk whether his relationship with Shriner would interfere with his getting a fair trial was futile given Lufrano's assertion that Shriner was exerting extreme and harmful influence over DeBusk.

The trial court's failure to appoint separate counsel or to take adequate steps to ascertain whether the risk was too remote to

warrant separate counsel was reversible error. (*Holloway*, 435 U.S. at 484, 55 L. Ed. 2d at 434, 98 S. Ct. at 1178-79.) The *Holloway* court stated:

> "[A]n attorney's request for the appointment of separate counsel, based on his representations as an officer of the court regarding a conflict of interests, should be granted. *** An 'attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial.' [Citation.] *** [D]efense attorneys have the obligation, upon discovering a conflict of interests, to advise the court at once of the problem." 435 U.S. at 485-86, 55 L. Ed. 2d at 435, 98 S. Ct. at 1179.

Shriner's convictions are reversed and a new trial is ordered. Based on this decision, it is not necessary to comment on Shriner's argument that he was denied his sixth amendment right to self-representation when the trial court refused to allow him to proceed *pro se* during the hearing on the pretrial motions.

■ After the oral arguments, this court allowed DeBusk to adopt Shriner's argument that the trial court erred in denying Assistant Public Defender Lufrano's motion that another attorney be appointed to represent Shriner. In that argument, Shriner states that Lufrano made it clear that he favored DeBusk over Shriner, thus prejudicing Shriner. During the trial, after the pretrial motions were decided, Lufrano represented only DeBusk. There was nothing stopping Lufrano from zealously defending DeBusk at the trial. He could have raised the compulsion defense or any other defense.

There are no allegations of a conflict between Lufrano and DeBusk or of ineffective assistance of counsel. Although it would have been preferable for the trial court to have appointed another attorney to represent Shriner when the potential conflict was first raised, the failure to do so was not error as it related to DeBusk. Shriner was forced to proceed *pro se*, but DeBusk was represented by his own conflict-free attorney.

■ Shriner and DeBusk also assert that the jury instructions for armed robbery were improper because they omitted a mental state, which is an essential element of the crime. Defendants contend that, even though the armed robbery statute does not expressly include a mental state, section 4—3(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 4—3(a)) provides that a mental state is required. Because armed robbery is not an absolute

liability offense, defendants argue, the mental state cannot be implied or presumed.

The issue was waived since there was no objection at trial nor alternative instructions tendered. During the jury instruction conference, the State tendered, and the court accepted, Illinois Pattern Jury Instructions, Criminal, Nos. 14.03 and 14.04 (2d ed. 1981) (hereinafter IPI Criminal 2d). Failure to object or tender an alternative jury instruction at trial results in a waiver of that issue on appeal. *People v. Reddick* (1988), 123 Ill. 2d 184, 198.

Even if the alleged error had not been waived, the jury instructions were not improper. This court has previously ruled that IPI Criminal 2d Nos. 14.03 and 14.04 correctly instruct the jury on the essential elements of robbery under Illinois law. See *People v. Coleman* (1990), 203 Ill. App. 3d 83, 97-98; *People v. Johnson* (1990), 199 Ill. App. 3d 577, 584-85; *People v. Childrous* (1990), 196 Ill. App. 3d 38, 54-55; *People v. Avant* (1989), 178 Ill. App. 3d 139, 146-49; *People v. Talley* (1988), 177 Ill. App. 3d 170; *People v. Anderson* (1981), 93 Ill. App. 3d 646.

Armed robbery (Ill. Rev. Stat. 1987, ch. 38, par. 18—2) is a general intent crime. (*People v. Banks* (1979), 75 Ill. 2d 383, 391.) General intent exists when the prohibited result may reasonably be expected to follow from the offender's voluntary act even without any specific intent by the offender. (*Talley*, 177 Ill. App. 3d at 173.) When the offense is a general intent crime and the mental state is necessarily implied by the circumstances of the crime, it is not error to omit the implied mental state from the issue instructions. *Talley*, 177 Ill. App. 3d at 173-74.

Defendants cite *People v. Grant* (1981), 101 Ill. App. 3d 43, 47, where his court ruled that the jury instructions relating to assault and criminal trespass to land were incorrect because they did not include one of the mental states included in section 4—3(a) of the Criminal Code of 1961. (Ill. Rev. Stat. 1979, ch. 38, par. 4—3(a).) *Grant* is distinguishable because assault and criminal trespass to land are specific intent crimes, thus making the mental state an essential element of those crimes. *Talley*, 177 Ill. App. 3d at 172.

Defendants' reliance on *People v. Gean* (1991), 143 Ill. 2d 281 is also misplaced. They suggest that the ruling in *Gean* indicated that whenever a mental state is omitted from the criminal statute, but is supplied by operation of section 4—3, it must be proven by the State. That was not the ruling. The Illinois Supreme Court ruled that section 4—104(b)(1) of the Illinois Vehicle Code (Ill. Rev. Stat. 1987, ch. 95½, par. 4—104(b)(1)) was unconstitutional because sec-

tions 4—104(a)(1) and 4—104(a)(2) (Ill. Rev. Stat. 1987, ch. 95½, pars. 4—104(a)(1), (a)(2)) were not absolute liability offenses, making knowledge the appropriate mental element. (*Gean*, 143 Ill. 2d at 287-88.) Because the purpose of sections 4—104(a)(1) and 4—104(a)(2) was to prevent chop shop activities, the court concluded, it was appropriate that the State prove that the defendant possessed the certificates of title and salvage certificates knowing that he did not have authority or knowing it was without complete assignment. (*Gean*, 143 Ill. 2d at 289.) Thus, the court ruled that those offenses were specific intent crimes, not general intent crimes, such as armed robbery.

Shriner and DeBusk then argue that they were denied a fair trial due to numerous implications of prior criminal conduct from witnesses. They contend that (1) the Rolandos' testimony regarding two lineups, one in Wheaton, implied other criminal involvement in Du Page County; and (2) Mr. Rolando's testimony that Shriner told him that times were hard and people like him "had to do things like this" was improper evidence of other crimes. Further, DeBusk claims that Shriner's cross-examination of Wedlaki elicited testimony that Wedlaki gave the police items belonging to someone else, thus indicating the existence of other crimes. Those issues are waived because there were no objections made to the comments at trial and they are not plain error.

Based on the foregoing, William DeBusk's convictions are affirmed. Edward Shriner's convictions are reversed and remanded for a new trial.

Affirmed in part; reversed and remanded in part.

GREIMAN, P.J., and RIZZI, J., concur.