2021 IL App (1st) 180995-U

THIRD DIVISION
June 23, 2021

No. 1-18-0995

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| Respondent-Appellee, | ) | |
| | ) | |
| v. | ) | No. 10 CR 1836 |
| | ) | |
| JOHN PALLOHUSKY, | ) | Honorable Diane Cannon, |
| | ) | Judge, presiding |
| Petitioner-Appellant. | ) | |

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Postconviction properly dismissed. Petitioner's claim of ineffective assistance based on conflict of interest was without merit.

¶ 2    After entering into a blind plea to charges of theft in excess of $100,000, petitioner John Pallohusky filed a *pro se* post-conviction petition alleging, among other things, that his plea counsel labored under a conflict of interest, thus violating his sixth amendment right to counsel. The circuit court dismissed petitioner's petition at the first stage. We affirm.

¶ 3 The facts surrounding defendant's arrest and guilty plea are more fully set forth in our earlier unpublished order. See *People v. Pallohusky*, 2017 IL App (1st) 151896-U.

¶ 4 Before his arrest, petitioner served as treasurer and later president of the Chicago Police Sergeant's Association (CPSA). Sometime in 2009, Chase Bank notified the Chicago Police Department's Internal Affairs Division that a Chase checking account owned by CPSA had been used to pay petitioner's personal credit card. An investigation followed.

¶ 5 Among other things, the investigation revealed that petitioner was responsible for providing financial information to the accounting firm that prepared CPSA's federal tax returns and that, for at least two years, CPSA's federal tax returns reported educational expenses that exceeded its annual revenue. In addition, between April 2007 and September 2009, petitioner wrote 33 checks worth a total of $306,020.37 to pay six personal credit cards. Between 2005 and 2009, petitioner wrote 315 CPSA checks worth a total of $709,600 that were made payable to "cash." In July 2007, a Citibank credit card account was opened in CPSA's name. The application listed CPSA's address, but the address on the account was switched to petitioner's within a few weeks. Between August 2007 and October 2009, CPSA checks were used to pay $253,419.16 towards balances that petitioner accrued on the Citibank Card. Finally, a November 2009 search of petitioner's home uncovered CPSA financial documents dating back to as early as 2005. During a companion search of CPSA's headquarters, none of the financial documents were located. In total, investigators determined that petitioner stole $1,154,039.83 from CPSA.

¶ 6 Based on that information, in November 2009, petitioner was arrested and charged with two counts of theft of over $500,000, two counts of official misconduct, and one count of money laundering over $500,000. On April 17, 2012, petitioner's case was set for trial. After the State

answered ready for trial, petitioner's attorney answered that he was not ready to proceed to trial. Instead, counsel informed the court that he had been in discussions with the State about resolving the case.

¶ 7    In the ensuing discussions, the State told the court that, based on representations from petitioner's attorney, it was seeking leave to amend the amount of loss alleged in Count 2 to reflect an amount greater than $100,000 but less than $500,000. The result of that amendment would have made petitioner's offense a probationable Class 1 felony. The State explained that if petitioner entered into a blind plea to the amended Count 2, then petitioner would be able to present evidence of any restitution he had paid to CPSA. In response to a question by the court, the State told the court that total value of petitioner's theft was "about 1.15 million dollars." The following colloquy then ensued:

> "THE COURT: Okay. Unless you're going to have that by May 7th, sir, you're looking at 15 years in the penitentiary. I highly discourage you, unless the 15 years is something that is embedded in your mind to do in the penitentiary, to enter a plea of guilty, a blind plea. I will not now, for you or anyone, be a collection agency. So if you have $1.1 million and can make your victims whole again prior to sentencing, congratulations.
>
> If you don't, you're looking at 15 years in the penitentiary, and two years mandatory supervised release of parole. So—
>
> [DEFENSE COUNSEL]: Judge, just—
>
> THE COURT: —knowing that, if you still want to enter a plea of guilty that's fine. If not we're going to trial today, bench or jury.

[DEFENSE COUNSEL]: Judge, just so the record is clear, [the prosecutor] and I, and Counsel have—

[COURT]: I don't really care—if you have an agreed-upon disposition, I'll go along with an agreement.

[DEFENSE COUNSEL]: Okay. All right.

THE COURT: A blind plea is up to me, and I don't think you want to take a blind plea in front of me unless you have $1.1 million that you're going to bring to the State's Attorney's Office with a certified check by May 7th. That's not going to happen, sir.

So, again, I'm not going to be a collections agency. Maybe they can't prove it. If they can, it's 15 years in the penitentiary is what you're facing, so, I don't know – you know. You appear to be an intelligent man. I want you to go into this eyes wide open.

You want to plead, fine. I'll accept your plea. Do not think of me as a collection agency. I'm not going to take $10 a month, $20 a month, $400 a month, a thousand dollars a month. This is not a payment plan situation, sir.

This case has been going on for two years, and I find it hard to believe that if there was [sic] payments, they wouldn't have been made by now, but that's up to you."

You want to plead, fine. I'll accept your plea. Do not think of me as a collection agency. I'm not going to take $10 a month, $20 a month, $400 a month, a thousand dollars a month. This is not a payment plan situation, sir."

¶ 8     Following that colloquy, defense counsel stated that he had explained to petitioner what he and the State had "discussed as restitution and what is agreed upon, and we'll get that done." The court then began administering Rule 402 admonishments to petitioner. At that point, defense

counsel suggested that "there is an agreement between us and the State, but that will be subject to several things." In response, the court asked the State if there was an agreed-upon disposition. The State told the court there was no agreement. The State then offered the following clarifying remarks:

"Mr. Beuke has approached us in the last day or so that he has indeed—[defendant] can, by—with property and other assets at his disposal, make the victims whole.

I told him if he can do that, he can present that in mitigation to your Honor at a sentencing hearing from thereon in when we do the sentencing hearing in May.

So, if he indeed comes up with a million point one dollars that is owed to the Chicago Police Sergeants Association, that that would be mitigation evidence in his behalf, and that we would take off—and he would not have to plea at this point to the Class One non-probationable offense."

The court then recessed to allow the parties to determine whether petitioner would be entering into a blind plea or an agreed-upon disposition.

¶ 9     When the court recalled the case, the State amended Count 2 so that the alleged loss amount resulted in a probationable Class 1 felony. The court then stated, "the agreement is for a blind plea to Count 2" and resumed admonishing petitioner pursuant to Supreme Court Rule 402. During the admonishments, the court stated, "Count 2, as originally charged, was non-probationable. The agreement is to amend Count 2 of this indictment only to a probationable Class One felony. The maximum penalty is 15 years in the penitentiary." The court stated that it would consider a sentence of probation if petitioner's victims were made whole. But at the same

time, the court warned petitioner that "the maximum penalty of 15 years in the Illinois Department of Corrections is available to me, should your victims not be made whole by the next court date."

¶ 10    After the Rule 402 admonishments concluded, the State provided a factual basis for petitioner's plea, which the court accepted. The case then proceeded to sentencing. During the sentencing hearing, petitioner recounted his efforts to obtain money to make restitution to CPSA. At the conclusion of the hearing, the court sentenced petitioner to 12 years' imprisonment.

¶ 11    On July 2, 2012, petitioner filed a motion to reconsider sentence. That motion was subjected to 11 continuances. On October 12, 2012, the court informed petitioner that it would still entertain a sentence of probation if he made full restitution. On July 24, 2013, petitioner informed the court that an additional $460,000 had been turned over to CPSA. In response, the court reduced petitioner's sentence to eight years' imprisonment.

¶ 12    Thereafter, petitioner filed a direct appeal in this court, which was docketed as Case No. 1-13-2786. On September 11, 2014, petitioner filed a motion for summary remand, alleging that the circuit court failed to admonish him pursuant to Rule 605(b) that he had a right to file a motion to withdraw his guilty plea. On September 25, 2014, a panel of this court entered an order summarily remanding the case to the circuit court with instructions to allow petitioner to file a motion to withdraw his plea.

¶ 13    Back in the circuit court, on December 23, 2014, petitioner filed a motion to withdraw his plea. In that motion, petitioner maintained that his plea was the product of ineffective assistance of counsel and that "he would not have pled blind, under these circumstances, unless he was assured he would receive probation."

¶ 14     At the hearing, petitioner testified that he began working for the Chicago Police Department in 1988 and ascended from patrolman to the rank of detective sergeant. On April 17, 2012, petitioner's case was set for trial, but Beuke told him the case would probably be continued. Petitioner testified that prior to April 17, 2012, he never had any discussions with Beuke about pleading guilty. Thereafter, petitioner testified that he was confused when the State began discussing the possibility of amending the charges because there had been no prior plea discussions. In addition, petitioner claimed that he did not know what a blind plea was.

¶ 15     Petitioner then explained that when the court called a recess, Beuke told him that he would "have to enter into a plea for four specific categories or things that the prosecution wanted in order to receive probation." Specifically, Beuke told petitioner that the State was demanding that petitioner assign to CPSA:  Those four things were: (1) petitioner's interest in his deceased wife's pension for ten years; (2) the cash value of petitioner's pension; (3) petitioner's interest in his wife's home; and (4) any liens on money that was seized during the police's investigation.

¶ 16     Petitioner testified that he told Beuke that he did not know how much those assets were worth. In addition, petitioner told Beuke that some of the assets were the subject of his wife's then on-going probate estate, and thus, he was not sure if he could transfer the assets to CPSA within the time frame demanded by the State and circuit court. Petitioner told Beuke that he was confused and needed additional time to ascertain how to accomplish the transfers, but Beuke told him he had to plead guilty to stay out of prison. Ultimately, when the case reconvened, petitioner pled guilty. According to him, it was at that time that he first heard the $1.15 million mentioned as the amount of restitution he owed.

¶ 17     During cross-examination, petitioner testified that he attended DePaul University and had straight A's. He stated that he worked as a police officer for 25 years. On approximately 100 occasions, he had been present in court when a defendant pled guilty. Nonetheless petitioner maintained that he did not know what a blind plea was. Petitioner then admitted that he understood (1) the circuit court's admonishment that he could be sentenced to up to 15 years if he did not pay $1.1 million in restitution; (2) the circuit court's admonishment that under a blind plea, the ultimate sentencing decision rested with the circuit court, and the court would not entertain the possibility of a payment plan as restitution; and (3) that there was no agreement with the State regarding his sentence. In addition, petitioner acknowledged that during his plea colloquy, he never informed the circuit court that he: (1) was confused, (2) did not understand the Rule 402 admonishments, or (3) did not understand the nature of the proceeding.

¶ 18     The circuit court flatly rejected petitioner's testimony. The court stated:

"I have to start off by saying, I have never in eighteen years been more clear about the consequences of a plea. I have never told someone three times what could happen to them. Ever. And that's because if for some reason I didn't feel the person wasn't intelligent enough to understand what I was saying I would have felt it necessary to order a behavioural clinical examination to make sure that the person was fit for the plea and knew what was going on around him.

In this case we have a Chicago police officer over 20 years, who took the sergeant's exam, somehow managed to work the streets on the West Side without being killed, who is now supposed to be of subnormal intelligence, after being a member of the National Honor Society and graduating from De Paul University, appearing before me

twenty-eight times with his lawyer, managing hundreds of thousands of dollars for a sergeants' organization, managing to hide the theft of over a million dollars from his fellow officers, and he can't understand apparently now English. It's absurd. It is so offensive to me that the only reason I wouldn't allow him to, if I could vacate this plea, go to trial and give you 15 years I would, but I believe the case law would prevent me from doing that since 12 was the original sentence.

I advised you of your rights after that plea. You said nothing about wanting to vacate your plea. But today, *Oh, I thought about it.* Yeah, you thought about it, and you did nothing about it because you knew that you had chance after chance after chance after chance to come up with the restitution to make your victims whole, not just because you were a police officer. I'd done the same with any criminal enterprise of theft: *Make your victims whole, I'll give you probation. I'll beg the state to make it a misdemeanour so you don't have a felony conviction.* But no victim on a guilty plea is not going to be made whole in my courtroom, and I don't think they have to go down to the Daley Center and sue you. You got the benefit of the bargain.

You came in here again on July 2nd, you didn't mention anything about that. When you came in here on July 2nd, you had paid them back some and I took that, like a fool I took that into consideration and lowered your sentence 4 years. For that break I get the accusation against me of taking a plea from a stupid man; from a man who is too stupid to know what's going on around him; from a man who talked to his lawyers not once, not twice, but according to him over twenty times. Do you know how many people hire a lawyer and don't talk to them three times?

Your lawyers, according to you under oath today, talked to you over twenty times about your case. That's above and beyond. And they mistakenly gave you credit that you didn't deserve as sergeant in the Chicago Police Department, because according to you you are just a buffoon.

There is not one scintilla of evidence that you did not know exactly what was going on. And I hope that a lawsuit makes the victims whole in this case when you are out of the penitentiary, sir, because I couldn't do it. You chose. You said, "Come on with it," with the penitentiary sentence. "You're not getting a dime from me." And then you got on that bus and you said, *Uh oh, I guess she was serious. I gave them a little money and I went down.* And now you want everything wiped away because you are too stupid. Mr. National Honor Society, sergeant, head of the sergeants' money, collecting a pension from the Chicago Police Department, when you are too dumb to know what a blind plea is according to you. I hope that that ends now. And I hope that the pension board gets a copy of what you have said today under oath so that they know that they are sending a complete idiot pension checks, who doesn't know what a blind plea is when I asked you and you said four times, and now you said under oath you didn't know what was going on after lawyers had talked to you over twenty times. It's beyond belief."

¶ 19 Petitioner appealed that order to this court. In that appeal, petitioner argued, among other things, that his plea was the product of ineffective assistance of counsel. We issued a Rule 23 order affirming the circuit court's order. With respect to petitioner's claim that plea counsel's representation was ineffective, we held that any possible prejudice petitioner might have suffered as a result of Beuke's (allegedly) deficient performance was cured by the circuit court's repeated

admonishment to petitioner that in order to receive a sentence of probation, he had to fully reimburse CPSA $1.15 million. See *People v. Pallohusky*, 2017 IL App (1st) 151896-U.

¶ 20     On January 23, 2018, petitioner filed a *pro se* postconviction petition. He raised many claims but presses only one on appeal: that he received ineffective assistance of counsel because Beuke labored under a conflict of interest: while he was representing petitioner, Beuke was a defendant in a lawsuit filed against him by the Fraternal Order of Police (FOP).

¶ 21     On March 19, 2018, the circuit court entered an order summarily dismissing the petition. The court gave various reasons for its ruling but, insofar as the claim of a conflict of interest (the only claim before us) is concerned, the court deemed that claim frivolous:

> "Petitioner's claim is wholly speculative and meritless. Petitioner does not make any showing that there was some sort of conflict *per se* where Beuke represented the prosecution at the same time that he represented petitioner. Nor can petitioner show that the court was apprised of any conflict, or that petitioner can show an actual conflict adversely impacted his performance. Even taking petitioner's allegations as true, petitioner does not allege that Beuke's involvement as a defendant in a federal lawsuit affected his performance in this case. Therefore, this claim is frivolous and patently without merit."

¶ 22     Petitioner timely appealed.

¶ 23     The Post-Conviction Hearing Act (725 ILCS 5/122-1, *et seq*. (West 2018)) provides a three-stage procedure for prisoners to challenge their convictions or sentences for violations of constitutional rights. *People v.* Knapp, 2020 IL 124992, ¶ 43. At the first stage, " 'the court considers the petition's substantive virtue rather than its procedural compliance.' " *People v. Allen*, 2015 IL 113135, ¶ 24 (quoting *People v. Hommerson,* 2014 IL 115638, ¶ 11). Because

"[m]ost postconviction petitions are drafted by *pro se* defendants," our supreme court has explained, "the threshold for a petition to survive the first stage of review is low." *Id.*; see *People v. Hodges*, 234 Ill. 2d 1, 9 (2009) (same).

¶ 24    Thus, so long as the petition "alleges sufficient facts to state the gist of a constitutional claim, even where the petition lacks formal legal argument or citations to authority, first-stage dismissal is inappropriate." *Allen*, 2015 IL 113135, ¶ 24. Indeed, a petition should be dismissed at the first stage only if the petition has no arguable basis in law or fact or relies on an indisputably meritless legal theory or fanciful allegation. *Allen*, 2015 IL 113135, ¶ 25; *Hodges,* 234 Ill. 2d at 16-17. "Where a petition presents ' "legal points arguable on their merits," ' it is not frivolous." *Allen*, 2015 IL 113135, ¶ 25 (quoting *Hodges,* 234 Ill. 2d at 11, quoting *Anders v. California,* 386 U.S. 738, 744 (1967)).

¶ 25    A defendant's sixth amendment right to effective assistance of counsel includes the right to conflict-free representation. *People v. Fields*, 2012 IL 112438, ¶ 17; see *People v. Spreitzer*, 123 Ill. 2d 1, 13 (1988) ("Effective assistance means assistance by an attorney whose allegiance to his client is not diluted by conflicting interests or inconsistent obligations."). The prohibition against conflicts of interest is based on the principle that 'no man can serve two masters.' " *Spreitzer*, 123 Ill. 2d at 13.

¶ 26    There are two categories of conflicts under Illinois law. The first category concerns "*per se*" conflicts. *Id.* at 14. A "*per se*" conflict exists when "certain facts about a defense attorney's status," standing alone, "engender[s] *** a disabling conflict." *Id.* Think of a defense attorney simultaneously serving as a part-time lawyer for the municipality that was criminally prosecuting his client (see *People v. Washington*, 101 Ill. 2d 104 (1984)); a defense lawyer simultaneously

serving as administrator of the crime victim's estate (see *People v. Coslet*, 67 Ill. 2d 127 (1977)); or a lawyer and his law firm simultaneously representing a company whose store had been burglarized, the store's owner, and the person accused of the burglary. See *People v. Stoval*, 40 Ill. 2d 109 (1968).

¶ 27    Under such circumstances, appearances are enough; "there is no need to show that the attorney's actual performance was in any way affected by the existence of the conflict." *Spreitzer*, 123 Ill. 2d at 15. Prejudice is presumed in those rare instances because the defendant's lawyer "had a tie to a person or entity—either counsel's client, employer, or own previous commitments—which would benefit from an unfavorable verdict for the defendant." *Id.* at 16.

¶ 28    The second class of conflicts includes everything that does not qualify as a *per se* conflict. See *id*. at 17 ("In a second class of alleged conflicts, neither our court nor the United States Supreme Court has used the term *per se,* and have sometimes refused to reverse a conviction without a showing that the conflict actually affected the attorney's performance."). When a defendant alleges the existence of a non-*per se* conflict, the analysis we employ depends on whether the circuit court was ever informed of the potential conflict. *Id*. at 17-18.

¶ 29    If the potential conflict is brought to the court's attention "at an early stage," then the court has "a duty" to either appoint new counsel or "take adequate steps to ascertain whether the risk of conflict was too remote ***." *Id*. at 18. "If such steps are not taken, the fact of a '*potential* or *possible* conflict may deprive the defendant of the guaranteed assistance of counsel.' " *Id*. (quoting *People v. Jones*, 121 Ill. 2d 21, 28 (1988)). Although "this rule is not *per se* ***, reversal of a conviction under this rule does not require a showing that the attorney's actual performance was in any way affected by the purported conflict." *Id.*

¶ 30     It's a different story if, as here, the circuit court was never informed about a potential non-*per se* conflict. "[I]f the trial court is not apprised of the potential conflict, then reversal of the conviction will only be had upon a showing that 'an actual conflict of interest adversely affected' counsel's performance." *Id*. (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980)). In practice, that means that "the defendant must point to some specific defect in his counsel's strategy, tactics, or decision making attributable to the conflict." *Id*. But the defendant "is never required to prove that his attorney's deficiencies did not constitute harmless error." *Id*. at 18-19. That is, a defendant who fails to apprise the circuit court of a potential conflict need not show that "the conflict contributed to his conviction" to obtain reversal. *Id*. at 19.

¶ 31     Because this alleged conflict of interest was not raised at any time to the circuit court before petitioner's plea, petitioner must allege an "actual conflict" of interest that "adversely affected" counsel's representation by identifying some "specific defect" in the representation that was "attributable to the conflict." *Id*. at 18-19. We agree with the circuit court that the petition failed to so allege.

¶ 32     The petition does not allege a conflict of interest. The fact that petitioner's lawyer, Bueke, was being sued by the FOP, while defendant was accused of stealing from the CPSA, does not show a conflict. FOP and CPSA are separate and distinct organizations. True, they both represent police officers (CPSA representing sergeants, specifically), but the petition does not even attempt to explain why the FOP's suit against Beuke would have caused him to advocate less than zealously in defense of petitioner, who was charged with stealing from a different entity altogether. Even the petition concedes that FOP "has a different agenda than [CPSA] and as such, at times is in direct conflict with what benefits each of their members."

¶ 33    The petition includes a docket entry sheet showing that FOP sued Beuke for fraud in a complaint filed in the circuit court of Cook County on February 10, 2012. The petition does not include the complaint itself, but we may judicially notice the complaint online (*In re N.G.*, 2018 IL 121939, ¶ 32), and we do so. See *Fraternal Order of Police, Lodge 7 v. Greg Bella et al.*, 2012 WL 476551 (Cir. Ct. Cook County, Illinois Feb. 10, 2012). That lawsuit did not allege any count solely against Beuke but alleged that Beuke, along with several other lawyers, conspired to overbill FOP for legal services rendered (or allegedly not rendered) in the defense of Chicago Police Commander Jon Burge in his federal prosecution for perjury and witness tampering.

¶ 34    Again, we cannot imagine how FOP, seeking to reclaim allegedly overbilled funds from various lawyers, would have any reason to benefit from the resolution of a criminal prosecution against petitioner, which concerned funds embezzled from CPSA.

¶ 35    It would be one thing had Beuke had been sued by CPSA. It would be possible in that scenario, at least for first-stage purposes, to entertain the suggestion of an actual conflict that could have prompted Beuke to bring the State's charges against petitioner to a quicker resolution in exchange for some favorable action in a civil lawsuit. But that hypothetical is far away from our facts. CPSA and FOP are different organizations. Petitioner has cited no decision suggesting anything close to a conflict of interest spawned by counsel's representation of petitioner while being sued by a different police organization. Nor can we imagine any. The claim of a conflict of interest has no arguable basis in law or fact.

¶ 36    We would add here that the record directly rebuts the petition's claim that defense counsel was motivated to quickly plead out defendant's case. Defense counsel asked for additional time to prepare for trial, even after the case had been continued more than once; the

trial court refused to grant a continuance and set out very specific terms by which the court would be willing to forgo imposing prison time for defendant's crimes—namely his timely restitution. And defense counsel sought additional time for defendant to gather the funds to pay this restitution. The record directly contradicts the claim that counsel was rushing to plead out defendant's case.

¶ 37    We thus agree with the circuit court that the claim of ineffective assistance, based on a conflict of interest, was patently without merit and was properly dismissed.

¶ 38    Affirmed.