NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 190907-U

NO. 4-19-0907

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 3, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Jersey County |
| SAMUEL L. PACE, | ) | No. 96CF35 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Joshua A. Meyer, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices Cavanagh and Steigmann concurred in the judgment.

**ORDER**

¶ 1  *Held*: The circuit court did not err in denying defendant leave to file a successive
postconviction petition.

¶ 2  Defendant, Samuel L. Pace, appeals the circuit court's denial of his motion for
leave to file a successive postconviction petition under section 122-1(f) of the Post-Conviction
Hearing Act (Act) (725 ILCS 5/122-1(f) (West 2018)). On appeal, defendant asserts the
dismissal is improper as he sufficiently pleaded a claim his trial counsel, Don Weber, acted
under a *per se* and actual conflict of interest while representing him at trial, as Weber had an
undisclosed relationship with the sheriff of Jersey County, Frank Yocom, who testified against
defendant. We affirm.

¶ 3  I. BACKGROUND

¶ 4        In April 1996, defendant was charged in Jersey County with the first degree murder of Madge Reynolds Crader (720 ILCS 5/9-1(a)(1) (West Supp. 1995)). Before trial, defendant was represented by different counsel, Eric Pistorius. Pistorius filed a motion to quash arrest and suppress evidence. At the hearing on this motion, Sheriff Yocom testified defendant's brother, Jeff Pace, called to report he had seen a body in defendant's garage. Sheriff Yocom, accompanied by other law-enforcement officers, went to defendant's residence. Regarding the discovery of Crader's body, Sheriff Yocom testified they "went to the doorway of the garage and peered through a window of the garage" and saw a body. When asked why Deputy Paul Cunningham would write in his report "upon inspection of the garage it was found to be secure with a padlock on the side walk-in door and black plastic or some type of heavy plastic was observed to be covering the inside windows of the garage" and there was "[n]o way to see in the garage, to see if anyone was in the garage," Sheriff Yocom testified he did not know why that was in the report, as they looked through the glass of the garage.

¶ 5        The circuit court denied the motion. A day after the hearing, Pistorius filed a letter to the judge and attached a partial transcript of grand-jury testimony. In the letter, Pistorius informed the circuit court Sheriff Yocom's grand-jury testimony conflicted with his testimony at the hearing on the motion to suppress. Pistorius highlighted Sheriff Yocom's grand-jury testimony, "We did look through the windows but were unable to see anything through the garage. They were covered."

¶ 6        A little over two months before the June 1997 trial, Weber appeared as defendant's counsel.

¶ 7        During *voir dire* proceedings, the circuit court introduced prospective jurors to Sheriff Yocom as a party to the case with the Jersey County state's attorney. Sheriff Yocom was

present every day of trial. He testified regarding the crime scene and defendant's arrest. According to Sheriff Yocom, Jeff reported Crader had been murdered by defendant and Jeff had seen her body in defendant's garage. Sheriff Yocom and other law-enforcement officers went to defendant's residence. There, Sheriff Yocom observed through a window defendant lying on his couch. Defendant was taken into custody. A deputy used keys he obtained from defendant to open the garage door. Sheriff Yocom stepped "[j]ust into the door." From there, the sheriff could see Crader's body on the floor. She was covered in blood.

¶ 8        The jury found defendant guilty of first degree murder. The circuit court sentenced defendant to a term of natural-life imprisonment.

¶ 9        Defendant has pursued multiple challenges to his conviction and sentence. He pursued a direct appeal; we affirmed. *People v. Pace*, No. 5-97-0467 (1998) (unpublished order under Illinois Supreme Court Rule 23). In July 1999, defendant filed his initial *pro se* postconviction petition, asserting 28 allegations of trial-counsel error, 17 allegations of appellate-counsel error, and 17 allegations of prosecutorial misconduct. After appointment of counsel, a voluntary dismissal of the petition, a motion to reinstate the petition, a remand by this court (see *People v. Pace*, No. 4-08-0260 (2008) (unpublished order under Illinois Supreme Court Rule 23)), and further proceedings in the circuit court, the circuit court ultimately denied defendant's petition in January 2010. On appeal, we affirmed upon granting appellate counsel's motion for leave to withdraw as counsel. *People v. Pace*, 2012 IL App (4th) 100161-U, ¶ 38.

¶ 10        Defendant also attempted to obtain leave to file a successive postconviction petition in December 2016. The circuit court's denial of this attempt is not the subject of this appeal. In that case, we granted appointed appellate counsel's motion to withdraw and affirmed the denial of defendant's *pro se* motion for leave to file a successive postconviction petition.

*People v. Pace*, 2019 IL App (4th) 170118-U, ¶ 31.

¶ 11　　　　　In October 2019, defendant filed another *pro se* motion for leave to file a successive postconviction petition, the subject of this appeal. Defendant states his appellate counsel, while working on the appeal from defendant's prior postconviction petition, discovered Weber wrote a nonfiction book, *Precious Victims*. Defendant wrote the following regarding the relationship between Weber and Sheriff Yocom, as revealed in that book:

> "*Precious Victims* is a true story about the murders of two different
> newborn babies from the same family; the mother was ultimately
> convicted of the second murder and sentenced to life in prison. The
> first crime took place in Jersey County, where [defendant's] case
> was prosecuted, and the second was in Madison County[.]
> Weber[,] who at the time was State's Attorney of Madison County,
> was the lead prosecutor in the Madison County case, and he
> worked closely with law enforcement in Jersey County, including
> [S]heriff Frank Yocom, to put the case together. He the[n] wrote
> *Precious Victims* about the trial. The book was later made into a
> TV movie of the same name. Weber wrote in warm and flattering
> tones about Yocom. The book shows Weber's love and respect for
> Yocom[.] [T]he book and movie made both Weber and Yocom
> into local celebrities and even superheroes[.] It also seems to have
> made Weber rich. Weber expresses his hate and dislike for
> criminals, especially those charged with murder, armed robbery,
> sex crimes, burglary[,] and theft in the book[.] *** [H]e admits in

the book that he was *** an assistant prosecutor in Jersey County

in 1985, during this time Yocom was the sheriff [of] Jersey

County. Yocom and Weber encounter each other again in Pace's

case[.] Yocom was still the sheriff of Jersey County at the time that

the [defendant] was tried and convicted. Weber did not disclose to

the [defendant] the fact that he knew Yocom or that he made a

great deal of money from a book starring Yocom. In fact[,] he

owed his writing career to Yocom and the [defendant] did not

know about the book and Yocom and Weber[']s relationship.

* * *

*** [In this case, Weber's] motives were related

to[ ]matters outside of the courtroom. In this case his motives

involved his relationship with Yocom and his potential interest in

repaying the sheriff who starred in the book that brought Weber so

much money and acclaim."

¶ 12    Defendant further alleged this conflict of interest revealed itself in conduct by

Weber during defendant's trial. Defendant contends that conflict prevented Weber from

impeaching Yocom regarding his contradictory claims about seeing the victim's body through

the garage window. Defendant further asserts the relationship prevented Weber from challenging

the fact Yocom sat at the prosecutor's table throughout trial proceedings and during hearings. In

further support, defendant cited a published decision in which Weber's conduct as the Madison

County State's Attorney, in a case unrelated to this one, was condemned. See *People v. Barton*,

122 Ill. App. 3d 1079, 1084-85, 462 N.E.2d 538, 543 (1984) (referring to Weber's conduct in the

proceedings as "wholly unjustified," "inappropriate," and "reprehensible").

¶ 13 The trial court denied defendant's motion for leave upon concluding he had not satisfied cause or prejudice. As to the issue of cause, the trial court found defendant failed to meet his burden of showing an external factor impeded his ability to present his conflict-of-interest claim in an earlier proceeding and, therefore, failed to adequately demonstrate cause. Regarding prejudice, the court found defendant failed to provide any evidence Weber had a relationship with Sheriff Yocom. The court observed while defendant need not prove allegations, he was required to "provide more than unsupported assertions and conclusions." The court emphasized there were no affidavits, documents, or anything in the record to support defendant's petition.

¶ 14 This appeal followed.

¶ 15 II. ANALYSIS

¶ 16 While the Act contemplates the filing of one postconviction petition, section 122-1(f) permits the filing of a successive postconviction petition if leave of court is granted. 725 ILCS 5/122-1(f) (West 2018). Leave of court should be granted if the petitioner demonstrates *cause* for the failure to bring the claim during the initial postconviction proceedings and *prejudice* resulting from that failure. *Id.* To show cause, a petitioner must identify "an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings." *Id.* To show prejudice, that petitioner must demonstrate "the claim not raised during his or her initial [postconviction] proceedings so infected the trial that the resulting conviction or sentence violated due process." *Id.* These considerations are commonly referred to as the "cause-and-prejudice test." See *People v. Moore*, 2020 IL App (4th) 190528, ¶ 14, 170 N.E.3d 204. To obtain leave to file a successive postconviction petition, a defendant

- 6 -

must satisfy both prongs of that test. *Id.*

¶ 17    The Act also requires that petitions filed under the Act "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2018). The purpose of the mandate in section 122-2 is to show the allegations in the petition "are capable of objective or independent corroboration." *People v. Hall*, 217 Ill. 2d 324, 333, 841 N.E.2d 913, 919 (2005). A petitioner's failure to comply with this requirement is a sufficient basis for summary dismissal during the first stage of postconviction proceedings (*People v. Delton*, 227 Ill. 2d 247, 255, 882 N.E.2d 516, 520 (2008)), as well as for the denial of leave to file a successive postconviction petition (see *People v. Wideman*, 2013 IL App (1st) 102273, ¶ 18, 994 N.E.2d 546).

¶ 18    After a *pro se* motion for leave to file a successive postconviction petition is filed, the circuit court should conduct a preliminary screening to ascertain whether the filing adequately alleges facts establishing cause and prejudice. *People v. Bailey*, 2017 IL 121450, ¶ 24, 102 N.E.3d 114. If the petitioner has done so, leave to file must be granted. *Id.* While a defendant need not conclusively establish cause and prejudice before granting leave, the cause-and-prejudice test creates a burden higher than the frivolous-or-patently-without-merit standard applied at the first stage of proceedings under the Act. *Moore*, 2020 IL App (4th) 190528, ¶ 15. A petitioner, to satisfy the cause-and-prejudice test, must "submit enough in the way of documentation to allow a circuit court to make that determination." *People v. Smith*, 2014 IL 115946, ¶ 35, 21 N.E.3d 1172 (quoting *People v. Tidwell*, 236 Ill. 2d 150, 161, 923 N.E.2d 728, 734-35 (2010)). Leave of court "should be denied when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting

documentation is insufficient to justify further proceedings." *Id.* We review *de novo* decisions made without an evidentiary hearing that deny leave of court to file a successive postconviction. *Moore*, 2020 IL App (4th) 190528, ¶ 15.

¶ 19    Here, regarding the prejudice prong of the cause-and-prejudice test, defendant argues he was denied due process as his attorney, Weber, was acting under a *per se* conflict of interest or an actual conflict of interest due to his relationship with Sheriff Yocom, a witness at defendant's trial. Defendant contends this conflict, as evidenced by Weber's book, denied him his constitutional right to conflict-free representation.

¶ 20    To prove these claims, defendant must establish a conflict of interest existed. To prove a *per se* conflict, defendant must present "facts about a defense attorney's status" that "engender, *by themselves*, a disabling conflict." (Emphasis in original.) *People v. Morales*, 209 Ill. 2d 330, 346, 808 N.E.2d 510, 513 (2004) (quoting *People v. Spreitzer*, 123 Ill. 2d 1, 14, 525 N.E.2d 30, 34 (1988)). The conflict may arise from "the defense attorney's prior or contemporaneous association with either the prosecution or the victim." See *Spreitzer*, 123 Ill. 2d at 14. To establish an actual conflict of interest, defendant must show an actual conflict of interest adversely affected his counsel's performance. *Id.* at 18. This requires defendant to point to some defect in counsel's performance attributable to the conflict of interest. *Id.*

¶ 21    While defendant's claims require proof of a relationship that created a conflict of interest, defendant provided no documentary evidence of that relationship. Defendant, instead, simply made unsupported, broad assertions about "flattering tones" in Weber's description of Sheriff Yocom and a working relationship between the two. Not only did defendant fail to attach documentation, but he also failed to comply with section 122-2's mandate he provide an explanation for the absence of that documentation if no documentation is available. 725 ILCS

5/122-2 (West 2018).

¶ 22    Defendant contends his failure to comply with section 122-2's documentation requirement should be excused. Defendant asserts, "as a *pro se* petitioner, he could not be expected to provide all parties with a copy of the apparently out-of-print book." While a defendant may be excused from providing "all parties" a copy of the book, the book itself is not the only means by which defendant could support his claim. For example, defendant could have provided photocopied excerpts of relevant passages, and an affidavit as to the authenticity of the excerpts, to support his claim. Or, if he lacked access to the book, provide an explanation regarding its absence. Without any documentation, defendant failed to comply with section 122-2 and to adequately establish the prejudice prong of the cause-and-prejudice test.

¶ 23                                III. CONCLUSION

¶ 24    We affirm the circuit court's judgment.

¶ 25    Affirmed.